**UNIVERSAL TITLE INSURANCE COMPANY, a Minnesota corporation, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 89–5330.**

United States Court of Appeals, Eighth Circuit.

Submitted May 17, 1990.

Decided Aug. 27, 1991.

William Estabrook, argued (Shirley D. Peterson, Gary R. Allen and Barbara I. Hodges, on brief), Washington, D.C., for appellant.

John M. Koneck, argued (Jon C. Nuckles, on brief), Minneapolis, Minn., for appellee.

Before McMILLIAN and ARNOLD, Circuit Judges, and FRIEDMAN,* Senior Circuit Judge.

McMILLIAN, Circuit Judge.

The government appeals from a final judgment entered in the United States District Court for the District of Minnesota in

* The Honorable Daniel M. Friedman, Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

favor of Universal Title Insurance Company ("Universal"), finding that Universal was entitled to be equitably subrogated to the rights of lienholders who were senior to a federal tax lien, which the insurer failed to discover in performing a title search incident to issuing two insurance policies. *Universal Title Insurance Co. v. United States*, No. 3-87-835 (D.Minn. Apr. 26, 1989) (*Universal Title*). For reversal, the government argues that the district court erred in subrogating Universal to the position of the prior lienholders because Universal has not met the prerequisites for asserting this equitable doctrine under Minnesota law. For the reasons discussed below, we reverse the judgment of the district court and remand the case to the district court to enter judgment in favor of the government.

## I.

The facts of the instant case are undisputed. On April 29, 1985, Rodney and Martha Hjelms purchased residential property, located in Richfield, Minnesota, from Diane Warner by way of warranty deed. At the time of purchase, the property was encumbered with the following liens: (1) a mortgage lien in favor of Midwest Federal Savings and Loan Association dated January 31, 1974, in the amount of $26,920.82; (2) a judgment lien in favor of Dwain W. Warner Jr. filed July 30, 1979, in the amount of $22,590.16; (3) county real estate taxes in the amount of $810.34; (4) a water and sewer charge lien in the amount of $379.81; and (5) a United States tax lien filed September 14, 1981, in the amount of $31,027.54. The Hjelmses borrowed the purchase money from Investors Savings Bank ("Investors"), which secured the loan by a mortgage deed. Prior to the sale, Universal conducted a title search of the property, but failed to discover the properly recorded federal tax lien, and the Hjelmses and Investors had no knowledge of the tax lien prior to closing. At the direction of the Hjelmses, Investors and Diane Warner, all of the liens and encumbrances, except the federal tax lien, were satisfied at the time of closing. After payment of consideration, Universal issued two title insurance policies, one to the Hjelmses insuring clear title and another to Investors insuring its first mortgage. Under the policies, Universal is responsible for the removal of the tax lien. The policies also provide that if Universal paid to remove claims or liens from the title, Universal would be subrogated to the rights of its insureds (the Hjelmses and Investors).

The day after closing, the Hjelmses received notice from the Internal Revenue Service ("IRS") advising them of the existence of the tax lien against their property. Universal offered the IRS $12,865.01 as full payment of the lien, an amount equal to the seller's net proceeds, or, in other words, the purchase price minus the amounts paid to satisfy the prior liens and closing expenses. The IRS stipulated that it had a practice of releasing its tax liens if it is paid all of the seller's proceeds after payment of prior liens and customary closing costs. However, the IRS refused to accept Universal's tender of payment equal to the amount of the seller's net proceeds in the instant case. The IRS and Universal agreed that Universal would deposit $76,000, the full market value of the property, into an escrow account in exchange for release of the tax lien. The parties also agreed that their rights and claims against the property would be transferred to the escrow account, pending resolution of their dispute by a court of competent jurisdiction.

On December 14, 1987, Universal filed a complaint in the United States District Court for the District of Minnesota, seeking a ruling that it was entitled to a full release of the federal tax lien upon payment of $12,865.01, the net proceeds of the sale paid to Diane Warner. Universal argued that the practice of the IRS was to accept the seller's net proceeds from the sale in exchange for full release of the lien, that the IRS would be unjustly enriched if it received an amount greater than the net proceeds, and that Universal was entitled to be equitably subrogated to the rights of the prior senior lienholders, which the Hjelmses and Investors paid off at the time of closing. Following a bench trial, the

district court concluded that Universal was "equitably subrogated to the rights of the owners of the prior mortgage liens and encumbrances," and that the government was entitled to $12,865.01 of the escrowed funds, with the balance distributed to Universal. *Universal Title*, slip op. at 5. This appeal followed.

## II.

We note initially that, although we defer to the district court's findings of fact, setting them aside only if "clearly erroneous," Fed.R.Civ.P. 52(a), we review its conclusions of law de novo. *SEC v. Comserv Corp.*, 908 F.2d 1407, 1411 (8th Cir.1990). "Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984). In addition, we engage in an independent review of the district court's interpretation of the appropriate state law, which in the instant case is Minnesota law. *Salve Regina College v. Russell,* —— U.S. ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). Finally, we note that neither party has presented controlling precedents for our consideration, and this court has found none that exactly match the unusual factual setting of this case.

On appeal, the government argues that the equitable doctrine of subrogation is inapposite to the instant case for three reasons. First, the government claims that Universal made no payment that would entitle it to subrogation. Second, the government contends that Universal is precluded from the equitable remedy of legal subrogation because its failure to discover the properly recorded federal tax lien was not an "excusable mistake of fact." Finally, the government argues that Universal is

not entitled to be subrogated to the rights of the senior lienholders because an insurer's subrogation rights extend only to one causing the loss to its insureds, in this case Diane Warner, the seller of the property who breached her warranty of good title.[1] We agree, and will address each point in turn.

 In addition to its substantive arguments with respect to each of the issues raised by the government, Universal argues that the government should be precluded from raising all but its second argument on appeal because they were not raised before the district court. *See American General Finance Corp. v. Parkway Bank & Trust Co.*, 520 F.2d 607, 608 (8th Cir.1975). The government counters that its argument before the district court, which essentially addressed the issue of whether the equities supported Universal's claim for subrogation, was broad enough to encompass all of its arguments on appeal. We agree.

 Although, as a general rule, we do not consider issues not presented to the district court, "a blanket statement condemning new arguments is far too broad." *In re Osweiler,* 346 F.2d 617, 621 (C.C.P.A.1965).

> The real question should be whether the new argument is such as to raise a new issue.... [W]e think it would be in disharmony with one of the primary purposes of appellate review were we to refuse to consider each nuance or shift in approach urged by a party simply because it was not similarly urged below.

*Id.* We also have the discretion to consider an issue for the first time on appeal "where the proper resolution is beyond any doubt, or 'where injustice might otherwise result,'" *Sanders v. Clemco Industries,* 823 F.2d 214, 217 (8th Cir.1987) (quoting *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941)), or when the argument involves a purely legal

---

**1.** In addition, the government argues that, even if the doctrine of subrogation applied to the facts of the instant case, Universal should be precluded from its benefits because the equities are not in its favor. Because we hold that

Universal is not entitled to be subrogated to the rights of the prior lienholders for the above-mentioned reasons, we need not address the issue of balancing the relative equities of the parties here.

issue in which no additional evidence or argument would affect the outcome of the case, *Donovan v. Williams Enterprises, Inc.*, 744 F.2d 170, 176 (D.C.Cir.1984).

### III.

■ Before addressing the points raised by the government on appeal, some discussion of the law of subrogation is appropriate. While subrogation is generally defined as "the substitution of one person in the place of another with reference to a lawful claim or right," 73 Am.Jur.2d *Subrogation* § 1 (1974), there are actually two distinct types of subrogation,[2] "conventional subrogation" and "legal subrogation," which is often confusingly called "equitable subrogation," due to its origin and basis in equity.[3] Conventional subrogation "occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid." *Id.* § 9. Legal subrogation, however, "has for its purpose the working out of an equitable adjustment and the doing of complete and perfect justice between the parties by securing the ultimate discharge of a debt by the person who in equity and good conscience ought to pay it." *Id.* § 3 (footnotes omitted). Unlike conventional subrogation, legal subrogation does not depend on contract, assignment, or privity. *Id.* In either case, however, the right to subrogation is predicated on the full payment of the debt or claim of another by one who is not a mere volunteer or intermeddler. *See City of Red Wing v. Eichinger*, 163 Minn. 54, 203 N.W. 622, 623 (1925); 73 Am.Jur.2d *Subrogation* § 11.

■ Although legal subrogation is a highly favored doctrine, it is not an absolute right, but rather, one that depends on the equities and attending facts and circumstances of each case. *See, e.g., Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692, 697 (5th Cir.1962). In general, the equity of the party seeking subrogation must be clear and substantial, and superior to that of other claimants. Finally, subrogation cannot be invoked where it would work an injustice, violate sound public policy, or result in harm to innocent third persons.

### IV.

A. "Full Payment of the Debt or Claim"

■ The government argues that Universal is not entitled to be subrogated to the rights of the lienholders who were senior to the federal tax lien because they were not paid by Universal. The government contends that the district court erroneously concluded that "the prior mortgage liens and encumbrances ... [were] released after being paid in full by Universal." *Universal Title*, slip op. at 5. The government notes, to the contrary, that the liens were extinguished at closing by payment with money advanced by the Hjelmses and Investors, the Hjelmses' mortgagee. Universal responds that, despite the statement by the district court, the government misconstrues the origin of its right to subrogation. Universal contends, in essence, that Investors and the Hjelmses were entitled to be legally subrogated to the prior liens by virtue of the fact that they paid them at closing in good faith and with the intention of establishing the primary claim to the property, and that this right was conventionally subrogated to Universal under the subrogation clause in the title insurance policy when it effected the release of the federal tax lien. In short, Universal argues that it now stands in the place of the Hjelmses and Investors. For the purposes of this discussion, we accept Universal's characterization of its claim to subrogation.

■ Although we recognize that an insured may contractually assign his or her right to subrogation to an insurer who pays the claim under which the right arises, there is nothing in the stipulated facts of the instant case to support Universal's con-

---

**2.** Some legal authorities regard assignment as a third type of subrogation. *See* 73 Am.Jur.2d *Subrogation* § 2 n. 6 (1974).

**3.** For the sake of consistency and clarity, we note that we will use the term "legal subrogation" in reference to the equitable remedy.

tention that it discharged the federal tax lien. Universal has paid the Hjelmses nothing; neither has it expended anything that would constitute a payment of the government's lien. According to the escrow agreement, the government's lien was merely transferred from the Hjelmses' property to the escrow fund, pending resolution of the dispute by a court of competent jurisdiction. The escrow agreement expressly retained all of the rights and claims of each party with respect to the disputed lien. In other words, the federal tax lien has not been extinguished; it continues in existence attached to the funds in the escrow account.[4] Therefore, we hold that the mere transfer of the lien from the property to the escrow account was insufficient to entitle Universal to be conventionally or legally subrogated to the rights of the prior lienholders.

### B. "Excusable Mistake of Fact"

■ The government also argues that Minnesota law precludes the application of legal subrogation in the instant case because Universal failed to undertake prudent business measures in searching for potential encumbrances to the Hjelms property. In other words, the government contends that Universal's failure to discover the properly recorded federal tax lien was not an "excusable mistake of fact," as required by Minnesota case law. We agree.

In *Heisler v. C. Aultman & Co.*, 56 Minn. 454, 57 N.W. 1053 (1894) (*Heisler*), the Minnesota Supreme Court articulated a two-pronged standard for determining whether a party, who has discharged another's obligations without knowledge of an intervening lien, should be subrogated to the rights of the superior discharged lien. It stated that, under such circumstances, the interests of substantial justice dictate that a court "may relieve one who

has acted under a justifiable or excusable mistake of fact ... where ... no injury to innocent parties will result." *Id.* 57 N.W. at 1053–54. In *Heisler*, the plaintiff was an individual surety on a note made by her son and secured by a second mortgage on land purchased by him. After the son defaulted on the note, the plaintiff paid the note in full without knowledge of the existence of a judgment lien, which was third in priority to the second mortgage. The Minnesota Supreme Court affirmed the trial court judgment, which subrogated the plaintiff to the rights of the second mortgage, and accorded her priority over the judgment lienholder to the proceeds of the sheriff's sale of the land. In reaching its decision, the court noted:

> Having caused [the mortgage] to be satisfied and discharged in ignorance of the existence of the judgment lien, under circumstances authorizing an inference of a mistake of fact, equity will ... give the party who made it the benefit of the equitable right of subrogation. To do so in this case is to prevent manifest injustice and hardship, and no superior intervening equities are interfered with.

*Id.* at 1054. The Minnesota Supreme Court also noted that the defendant was not placed in a worse position by subrogating the plaintiff to the rights of the mortgagee because it had notice of the plaintiff's cause of action, which was filed before the sheriff's sale. *Id.*

A more recent Minnesota Supreme Court decision reiterated the *Heisler* standard for the application of legal subrogation. *Carl H. Peterson Co. v. Zero Estates*, 261 N.W.2d 346, 348 (Minn.1977) (*Peterson*). In *Peterson*, the Minnesota Supreme Court rejected a bank's argument that a 1973 mortgage should be subrogated to a 1970 mortgage for the purpose of gaining priori-

---

**4.** The fact that the District Director of the Internal Revenue Service issued a certificate of discharge on the Hjelms property does not alter our holding in this case. We do not limit our examination to mere forms or technicalities, but rather, consider the substance of a given transaction. *See, e.g., United States v. Pegg*, 782 F.2d 1498, 1501 (9th Cir.1986) ("equity will disregard mere form, and will ascertain and act on the

substance of things"); *see also* 73 Am.Jur.2d *Subrogation* § 13 ("in applying the doctrine of subrogation, the court will disregard mere form and technicality"). In the instant case, the certificate of discharge was issued pursuant to the escrow agreement, which transferred all of the government's rights and claims to the escrow fund.

ty over intervening mechanics liens, despite the fact that the proceeds of the second loan were used to pay the balance of the first loan, as well as certain delinquent taxes, and that the bank had no actual knowledge of intervening mechanics liens on the same property. *Id.* In assessing whether the bank acted under an "excusable mistake of fact," the court distinguished the factual situation from *Heisler,* stating

[t]he bank in this case has not demonstrated such equities in its favor. Unlike the unsophisticated individual wholly unaware of a judgment lien, the bank is a professional lender with knowledge of construction in progress giving rise to inchoate liens for contractors and materialmen. Its failure to consider potential priority conflicts and to obtain subordination agreements from them, as well as its failure to ascertain that its mortgagor was maintaining insurance in force, cannot be deemed justifiable as an excusable mistake.

*Id.*[5]

We believe that the *Peterson* case indicates that the Minnesota courts impose stricter standards on professionals than lay persons in assessing whether mistakes are "excusable" for purposes of the doctrine of legal subrogation, especially when the professional relationship arises out of a commercial transaction involving consideration. It is unreasonable to believe that the Minnesota Supreme Court would distinguish a title insurer from a bank; both are professional enterprises experienced in the area of secured transactions involving real property.

Our interpretation of *Peterson* is consistent with other jurisdictions, which have imposed stricter standards on professionals in contexts similar to the instant case. For example, the Washington Supreme Court distinguished between purchasers of real estate and a title insurer, noting that "[t]he former are bona fide purchasers to the extent that they were entitled to rely upon

others who were paid to give an expert opinion and insure title. The latter are engaged in giving those expert opinions for a consideration. In equity, [the purchasers] and [the title insurer] are poles apart." *Coy v. Raabe,* 69 Wash.2d 346, 418 P.2d 728, 731 (1966) (*Raabe*). In elaborating on this dual standard, the court stated:

It would be a gross misapplication of the doctrine of subrogation were we to hold that its cloak settles automatically upon one who has simply made a mistake, when it is a commercial transaction involving consideration. [The title insurer's] relationship is governed by the law of contracts. Further, it is difficult to think of a situation in which a title insurance company could not claim unjust enrichment as to someone who might inadvertently benefit by their negligence. Either they insure or they don't. It is not the province of the court to relieve a title insurance company of its contractual obligation. [The insurer] has not cited us authority to the contrary.

*Id.*

The Indiana Court of Appeals also indicated a less deferential standard in a decision affirming the denial of subrogation to a title insurer, who by "mistake" failed to exempt from coverage a strip of land, which had previously been sold. *Lawyers Title Insurance Corp. v. Capp,* 174 Ind. App. 633, 369 N.E.2d 672, 674 (1977) (*Capp*). In its opinion, the *Capp* court noted that the insurer's mistake arose out of a "commercial transaction involving a consideration.... [which] is governed by the law of contracts." *Id.* (quoting *Raabe,* 418 P.2d at 731). In addition, the New Mexico Court of Appeals held that a title insurer's failure to conduct a more thorough title search to determine whether a federal tax lien was recorded against insured property constituted negligence, which precluded it from being subrogated to the IRS lien, despite the owner's assurances that the property was unencum-

5. Contrary to Universal's claim, the Minnesota Supreme Court did not indicate that the trial court found that the bank had actual knowledge of the inchoate liens, but rather, that the bank

"failed to consider potential priority conflicts and to obtain subordination agreements from them." *Carl H. Peterson Co. v. Zero Estates,* 261 N.W.2d 346, 348 (Minn.1977) (*Peterson*).

bered. *USLIFE Title Insurance Co. v. Romero,* 98 N.M. 699, 652 P.2d 249, 252–53 (Ct.App.1982) (*Romero*) (citing *Capp,* 369 N.E.2d at 674; *Raabe,* 418 P.2d at 731).

Having considered the relevant Minnesota case law, we believe that the instant case is more analogous to *Peterson* than *Heisler.* Universal is a professional enterprise, which is in the business of insuring marketable title to real property. Although Universal contends that it exercised prudent business practices in investigating the title to the Hjelms property, it fails to explain what precautions it took or why it failed to discover the properly recorded federal tax lien. Its claim that it sought and received assurances from the seller that there were no liens, other than those discharged at closing, is patently insufficient. It has long been recognized that purchasers of real property are expected "to consult available records in regard to contemplated real property transactions ... [to minimize] the effect of any uncertainty of representation between vendor and vendee concerning existing incumbrances of record." *Belcher v. Belcher,* 161 Or. 341, 87 P.2d 762, 765 (1939). We can expect no less from a title insurer.

Universal's inability to explain its failure to find the properly recorded federal tax lien is significant, because Universal had the burden of persuasion at trial of demonstrating its entitlement to subrogation. *See Peterson,* 261 N.W.2d at 348. In light of the Minnesota Supreme Court's decision in *Peterson,* we hold that the district court erred in finding that Universal's failure to discover the federal tax lien was an excusable mistake of fact. On the contrary, we must conclude, under these circumstances, that Universal's failure to detect the federal tax lien resulted from negligence, and therefore, it is not entitled to be legally subrogated to the rights of the prior senior lienholders.[6]

## C. "Innocent Third Party"

The government's third argument is that Universal is not entitled to the benefits of legal subrogation because, under Minnesota law, its right to subrogation, if any, extends only to its insureds' (Investors and the Hjelmses) claims against individuals whose negligence or wrongful act caused a compensable loss. The government contends that, because it was not notified of the sale between Warner and the Hjelmses and did not conceal, either actively or passively, the existence of the federal tax lien, it could not have caused the loss to Investors or the Hjelmses. Rather, the government contends that the loss resulted from the seller's breach of her warranty of good title under the warranty deed, as well as Universal's failure to discover the federal tax lien. We agree.

In *Board of First Congregational Church v. Cream City Mutual Insurance Co.,* 255 Minn. 347, 96 N.W.2d 690 (1959) (*Cream City*), the Minnesota Supreme Court held, in part, that an insurer who contracts to provide insurance coverage in exchange for fair consideration, without knowledge of the insured's collateral rights, is not entitled to be subrogated to the rights of the insured against a third person who did not cause the compensable loss. While the Minnesota Supreme Court acknowledged the general rule that an insurer is entitled to be subrogated to the insured's rights against one who wrongfully caused a compensable loss, it noted:

[T]here is no such agreement of authorities as to the right of an insurer to be subrogated to collateral contract rights which the insured has against a third person *who did not cause the loss....* [T]o give the insurer the benefit of the collateral obligation through subrogation ignores the plain terms of the insuring agreement and provides the insurer with a windfall. Its premiums are assumed to represent the fair equivalent of the obli-

---

**6.** We also hold that the district court erred in relying on *London & N.W. Am. Mortgage Co. v. Tracy,* 58 Minn. 201, 59 N.W. 1001 (1894) (*Tracy*), and *Emmert v. Thompson,* 49 Minn. 386, 52 N.W. 31 (1892) (*Emmert*), as controlling law in the factual situation of the instant case. We believe the more recent *Peterson* case takes precedence over these nineteenth century cases. The fact that Universal insured clear title to property for valuable consideration also distinguishes the instant case from *Tracy* and *Emmert. See* discussion IV C *infra.*

gation it contracted to incur without knowledge of the existence of collateral remedies.

*Id.* 96 N.W.2d at 695–96 (emphasis added). Although the facts of *Cream City* are not exactly on point, we believe the Minnesota Supreme Court's holding supports the government's contention that an insurer has no right of subrogation as against a third party who has not caused the insured's loss.

 Universal argues that the subrogation clause of the title insurance policies evidence the fact that it anticipated a right to legal subrogation in the event undiscovered liens existed against the Hjelms property, a consequence that was also reflected in the premiums. Although Universal concedes that the seller, and not the IRS, caused the loss in the instant case, it argues that its right of subrogation is not limited to application against the seller. Universal contends that it makes no equitable difference if it is allowed to assert its insureds' subrogation rights against the government, because the government would still receive the amount of the seller's net proceeds in satisfaction of the tax lien, and thus the status quo would be preserved. Rather, Universal argues that denying it the right to subrogation under these circumstances would allow the government to benefit from Universal's mistake, resulting in a windfall to the government. We disagree.

Universal's argument begs the question. Universal erroneously assumes that the conclusion to its argument is true—that is, that the IRS is limited to recovering $12,-865.01, the seller's net proceeds, because of the IRS's past practice of releasing tax liens upon receipt of the seller's net proceeds. We also reject Universal's contention that denying it the right of subrogation will result in a windfall to the government. On the contrary, the government will simply receive that which it is entitled—full payment of the federal tax lien.

The IRS properly recorded its tax lien, and the government is legally entitled to be paid the full amount of that lien. The fact that the IRS has, in the past, gratuitously released liens in exchange for payment of less than the full amount of the lien is immaterial. The government has the discretion to decide whether to insist upon full payment of its lien or to accept a lesser amount.

 Even if we accept Univeral's argument that the IRS would have settled for the seller's net proceeds had it been informed of the sale, it does not change our holding here. The doctrine of legal subrogation requires more than a showing that a junior lienholder will be placed in a better position than the lienholder would be in if legal subrogation applied. *See Fidelity National Title Insurance Co. v. Department of the Treasury,* 907 F.2d 868, 871 (9th Cir.1990) ("neither [buyer] nor [title insurer] is entitled to [legal] subrogation merely because the IRS might now recover more on its tax lien than it could have had it been a party to the foreclosure sale").

Universal agreed to insure marketable title to the Hjelms property, for which it received valuable consideration. It is uncontested that, by virtue of this contract, Universal incurred the obligation to discharge the underlying federal tax lien. Universal cannot now minimize this obligation by resorting to the equitable doctrine of legal subrogation at the expense of the government's preexisting legal right. "'Subrogation is the creature of equity, and will not be permitted where it will work injustice to the rights of those having equal or superior equities, or where it will operate to defeat a legal right.'" *Benson v. Saffert–Gugisberg Cement Construction Co.,* 159 Minn. 54, 198 N.W. 297, 299 (1924) (citation omitted). We therefore hold that Universal is not entitled to invoke legal subrogation, as against the government, under the facts and circumstances of the instant case.[7]

---

**7.** Our holding does not leave Universal entirely without a remedy. After paying the federal tax lien in full, Universal could seek legal subrogation to the rights of the IRS as against the seller, who was unjustly enriched by her breach of warranty of good title. "There is ample authority for the proposition that one, who has paid taxes to protect his own rights and not as a

## V.

In sum, we hold that Universal is not entitled to be subrogated to the rights of the prior lienholders, under Minnesota law, because it made no payment that would entitle it to subrogation, its failure to discover the federal tax lien was not an "excusable mistake of fact," and its subrogation rights, if any, do not apply as against the government, which was not responsible for Investors' and the Hjelmses' loss. Accordingly, we reverse the judgment of the district court and remand the instant case to the district court with directions to grant judgment in favor of the government.

volunteer or intermeddler, may be subrogated to the rights of the state or of the one who had acquired the state's rights." *Sucker v. Cranmer,* 127 Minn. 124, 149 N.W. 16, 18 (1914); *see also* 73 Am.Jur.2d *Subrogation* § 66 ("it is quite generally held that where a person having an interest in the property pays the taxes or assessments due from another, he is subrogated to the lien of the state or other public body") (citations omitted).