WELLS FARGO BANK, MINNESOTA, N.A., Appellant,

v.

COMMONWEALTH of Kentucky, FINANCE AND ADMINISTRATION, DEPARTMENT OF REVENUE, (f/k/a Revenue Cabinet), Appellee.

Central Bank of Jefferson County, Inc., (f/k/a First Bank, Inc.), Appellant,

v.

Commonwealth of Kentucky, Finance & Administration Cabinet, Department of Revenue, (f/k/a Revenue Cabinet), Appellee.

Nos. 2008–SC–000419–DG, 2008–SC–000427–DG.

Supreme Court of Kentucky.

April 21, 2011.

As corrected Aug. 25, 2011.

Rehearing Denied Aug. 25, 2011.

John W. Wooldridge, Waller & Wooldridge, Shepherdsville, KY, David Eric Johnson, Lerner, Sampson & Rothfuss, Cincinnati, OH, Counsel for Wells Fargo Bank, Minnesota, N.A.

Barbara Curtin Kenney, Department of Revenue, Finance and Administration Cabinet, Frankfort, KY, Counsel for Commonwealth of Kentucky, Finance and Administration, Department of Revenue, (f/k/a Revenue Cabinet).

Thomas Dupont Murphy II, Jennifer Hatcher, Ackerson & Yann, PLLC, Louisville, KY, Counsel for Central Bank of Jefferson County, Inc. (f/k/a First Bank, Inc.).

Opinion of the Court by Special Justice LAWRENCE L. JONES II.

This consolidated appeal presents two key questions for the Court's determination: 1) Are general tax liens created pursuant to the former KRS 134.420(2) (now KRS 131.515) superior to later filed mortgage liens? 2) Does the doctrine of equitable subrogation act to displace the priority of an earlier recorded KRS 134.420(2) general tax lien? The Court resolves that the Commonwealth of Kentucky's prior-recorded KRS 134.420(2) tax liens enjoy priority pursuant to the long established first-to-file doctrine. Moreover, the Court declines to apply the doctrine of equitable subrogation to relieve a professional lender of a negligent title examination. Accordingly, we affirm the ruling of the Court of Appeals.

## I.  BACKGROUND

This case arises from the consolidated appeal of *Commonwealth v. Central Bank of Jeff. Co., Inc., et al.*, No. 2007–CA–000009–MR, and *Commonwealth v. Wells Fargo Bank, Minn., N.A., et al.*, No. 2007–CA–000833–MR, 2008 WL 1991642. In the underlying cases, the respective property owners failed to satisfy their debt obligations to professional lending institutions, which precipitated foreclosure proceedings. In both cases, the professional lenders assert that their respective mortgages are superior to the general tax liens filed pursuant to KRS 134.420(2).

### a.  *Commonwealth v. Central Bank of Jeff, Co., Inc., et al.*

This case arises out of the refinancing of a mortgage. On or about August 17, 1998, Shannon and Steve Foster executed a promissory note and mortgage in favor of Commonwealth Bank 85 Trust Company ("CB & T") as security for the purchase of the subject property (the "Foster Property").

Almost three years later, the Commonwealth of Kentucky's Department of Revenue (the "Commonwealth") filed a tax lien against Steve Foster in the Jefferson County Clerk's Office, pursuant to KRS 134.420(2), on or about July 11,2001.

On or about July 26, 2001, the Fosters executed a promissory note ("Note I") in the amount of $116,250.00 in favor of Cen-

tral Bank of Jefferson County, Inc. f/k/a First Bank, Inc. ("Central Bank"). Note I was secured by a Mortgage ("Mortgage I") on the Property, which was recorded on August 17, 2001 in the Jefferson County Clerk's Office. CB & T's mortgage was released on August 20, 2001.

According to Central Bank, the Fosters used $110,738.48 of the proceeds from Note I to satisfy a mortgage on the Property held by CB & T. The Fosters also used $5,704.03 of the proceeds to extinguish certain *ad valorem* tax liens on the Property consisting of: (1) a 1998 delinquent tax bill in the amount of $1,771.14; (2) a delinquent tax lien for the City of Louisville in the amount of $323.21; and (3) a delinquent tax lien from 1999 and 2000 in the amount of $3,609.68. No proceeds were used to pay the Commonwealth's KRS 134.420(2) lien against the Foster property.

On or about July 26, 2001, the Fosters also executed and delivered a second note to Central Bank evidencing a $15,000.00 revolving line of credit ("Note II"). Note II was secured by a mortgage ("Mortgage II") on the Property and was recorded on August 17, 2001 in the Jefferson County Clerk's Office. According to the Settlement Statement, proceeds were used to satisfy closing costs, title insurance, prepaid taxes and hazard insurance. Additionally, the proceeds of Note II were used to satisfy the Fosters' debts to various credit card companies.

On September 6, 2001, the Commonwealth filed a tax lien against Shannon Foster in the Jefferson County Clerk's Office.

On January 12, 2006, Central Bank initiated a foreclosure action against the Foster Property in Jefferson Circuit Court. Central Bank moved for summary judgment, arguing that the Mortgage I lien should be granted priority over all other liens on the property because the proceeds were used to extinguish CB & T's purchase money mortgage and the *ad valorem* tax liens filed against the Fosters.

On June 19, 2006, the Jefferson County Master Commissioner issued his recommendation and finding that Mortgage I would be granted priority to the extent the proceeds were used to satisfy the purchase money mortgage and the *ad valorem* tax liens. The Master Commissioner based his findings on the doctrine of equitable subrogation.

Both parties filed exceptions to the Master Commissioner's report. Notably, the Commonwealth argued that KRS 134.420 granted liens created pursuant to that section a "super priority" and that the doctrine of equitable subrogation was no longer viable under Kentucky law. The Master Commissioner issued a new report on August 28, 2006 recommending denial of the exceptions. Thereafter, on November 30, 2006, the Jefferson Circuit Court entered a judgment and order of sale granting Central Bank's Mortgage I and II liens priority over the other liens.

The Commonwealth appealed the Jefferson Circuit Court's ruling. The Kentucky Court of Appeals resolved that the Jefferson Circuit Court had erred in reordering the priorities and reversed the judgment.

### b. *Commonwealth v. Wells Fargo Bank, Minn., N.A., et al.*

This case arises from the initial purchase and financing of a home by Joseph A. Clark and Janet M. Clark on or about November 16, 2001 (the "Clark Property").

Several years before purchasing their home, the Commonwealth filed a general tax lien against Joseph A. Clark on June 14, 1996 in the Bullitt County Clerk's Office, pursuant to KRS 134.420(2).

Over five years later, at the time of purchase, the Clarks executed a mortgage in favor of The Provident Bank, which was recorded on November 29, 2001 (the "Purchase Money Mortgage"). The Provident Bank assigned the Purchase Money Mortgage to Wells Fargo Bank, Minn., N.A. ("Wells Fargo"), by an assignment recorded on February 14, 2003 (the "Assignment").

After the Assignment, the Commonwealth filed two additional liens against Mr. Clark, one on August 24, 2004 and another on October 20, 2004.

On November 9, 2004, Wells Fargo initiated foreclosure proceedings against the Clark Property. Wells Fargo subsequently moved for summary judgment and an order of sale granting its Purchase Money Mortgage priority over the Commonwealth's KRS 134.420(2) liens. Relying upon *Kentucky Legal Systems Corp. v. Dunn,* 205 S.W.3d 235 (Ky.App.2006), the Bullitt Circuit Court ruled that a purchase money mortgage takes priority over all other recorded liens and judgments unless otherwise agreed or specified by statute. The Bullitt Circuit Court held that KRS 134.420(2) provides no such exception.

The Commonwealth appealed the Bullitt Circuit Court's ruling. The Kentucky Court of Appeals resolved that the Bullitt Circuit Court had erred in reordering the priorities and reversed the judgment.

## II. ANALYSIS

### a. *Kentucky's Recording Statutes*

No mortgage, deed or deed of trust conveying real property is valid against a purchaser for a valuable consideration, without notice thereof, or creditors until it is properly filed. KRS 382.270. A mortgage, deed or deed of trust shall take effect at the time it is filed. KRS 382.280. The combined effect of these statutes is known as the "race-notice" rule. In other words, one must not only be the first to file the mortgage, deed or deed of trust, but the filer must also lack actual or constructive knowledge of any other mortgages, deeds or deeds of trust related to the property.

▮▮▮▮ The common law as it relates to lien creditors is slightly different. This Court has long held that that the first creditor to file its lien enjoys the first right to the debtor's property. This general rule of lien preference has become known as "first in time, first in right." *Truck Corp. of Ky. v. Hurry Up Broadway Co.,* 222 Ky. 521, 1 S.W.2d 990 (1928). It is without question, however, that the Kentucky General Assembly is empowered to create statutory liens and establish their priorities; but, absent a statute giving precedence to a statutory lien, its rank is determined under the principle of first in time, first in right. *Midland–Guardian Co. v. McElroy,* 563 S.W.2d 752 (Ky.App. 1978).

### b. *Kentucky's Tax Lien Statute*

▮▮▮▮ "The power to tax is inherent in the sovereignty of the state, and is essential to its existence." *Reynolds Metal Co. v. Martin,* 269 Ky. 378, 382, 107 S.W.2d 251, 253 (1937). Except to the extent that the Commonwealth's taxing power may be prohibited or limited by the State's Constitution, or that of the United States, it may be exercised without limit. *See id.*

▮▮▮▮ Every citizen of the Commonwealth of Kentucky has an enforceable duty to pay taxes properly levied. In an effort to protect its tax base and to aid in the collection of past due tax revenue, the Kentucky General Assembly created certain "tax liens" with the passage of KRS 134.420.

Prior to its amendment during the 2009 legislative session, KRS 134.420 contained five subsections. Subsection 1, which is the current version of KRS 134.420, related to *ad valorem* taxes, or taxes based upon the value of real or personal property. Because this case does not involve *ad valorem* taxes, this provision is inapplicable to this case. The remaining subsections of the old KRS 134.420 addressed general tax liens.

For purposes of resolving this case, subsections 2 and 4 are particularly applicable. The prior version of subsection 2, which is now contained in KRS 131.515, provided that:

> (2) If any person liable to pay any tax administered by the Department of Revenue, other than a tax subject to the provisions of subsection (1) of this section, neglects or refuses to pay the tax after demand, the tax ... shall be a lien in favor of the Commonwealth. The lien shall attach to all property and rights to property owned or subsequently acquired by the person neglecting or refusing to pay the tax.

The prior version of subsection 4, now KRS 131.515(3), provided that the lien created by the statute "shall not be valid as against any purchaser, judgment lien creditor, or holder of a security interest or mechanic's lien until notice of the tax lien has been filed ... with the county clerk...." *Id.* Moreover, "[t]he recording of the tax lien shall constitute notice of both the original assessment and all subsequent assessments of liability against the same taxpayer." *Id.*

Both lenders in this case argue that the old KRS 134.420(1) provided a super priority[1] for *ad valorem* taxes, but that the general tax lien provision enjoys no special priority. We disagree.

Subsection 4 fixes the priority of general tax liens. *See Liberty Nat'l Bank & Trust Co. of Lou. v. Vanderkraats,* 899 S.W.2d 511 (Ky.App.1995) ("[C]onsidering section (4) in light of section (2), we see that section (4) is indeed a *priority* statute.") (emphasis in original). *See also Commonwealth v. Hall,* 941 S.W.2d 481, 483 (Ky. App.1997). Indeed, subsection 4 clearly and explicitly states that a properly filed tax lien shall be valid against any purchaser, judgment lien creditor, or holder of a security interest. It is undisputed that a mortgage is a security interest and that the professional lenders in this case are holders of those security interests. *Allen v. Shepherd,* 162 Ky. 756, 760, 173 S.W. 135, 136 (Ky.1915) ("The rule in this State in reference to mortgages, whether on personal or real estate, is, that they are mere securities for the debt.")

Wells Fargo relies upon *Kentucky Legal Systems Corp. v. Dunn,* 205 S.W.3d 235 (Ky.App.2006) for the proposition that a "purchase money mortgage" enjoys an absolute priority over all liens. The holding in *Dunn,* however, was much narrower.

In *Dunn,* the Kentucky Legal Systems ("KLS") argued that its *judgment lien* was senior to the lender's purchase money mortgage pursuant to the "first in time, first in right" doctrine. *Id.* at 236. KLS also argued that the lender was on "constructive notice" of the judgment lien and that the lender "failed to exercise due care" before making the loan. *Id.* After concluding that neither KRS 382.270 nor

---

1. Both lenders argue that the following language creates the super priority for *ad valorem* taxes: "This lien shall not be defeated by gift, devise, sale, alienation, or any means except by sale to a bona fide purchaser, but no purchase of property made before final settlement for taxes for a particular assessment date has been made by the sheriff shall preclude the lien covering the taxes."

KRS 382.280 "foreclose the possibility of an exception for purchase money mortgages to the ordinary rules of priority" the court of appeals held that Kentucky should adopt the Restatement (Third) view that "third parties who lend money used to purchase real estate in exchange for a mortgage hold special priority over all other recorded liens and judgments *except where agreed otherwise by the parties or specified by statute.*" *Id.* at 237 (emphasis added). Further, the *Dunn* court held that the lending institution as a "purchase money lender, did not need to search for judgment liens, as they should be given a first priority over a judgment lien regardless of whether they had notice of any kind of interest." *Id.*

Judgment liens and tax liens are two different creatures, created by two different statutes. They also serve different public policy purposes, one favors collecting on civil judgments, the other favors collecting tax revenue that is necessary to fund our government. Judgment liens are created by KRS 426.720, which does not create a special priority for such liens. KRS 134.420, however, specifically establishes a priority for the tax liens created therein. Accordingly, because *Dunn* addressed judgment liens, not KRS 134.420(2) tax liens, we find it to be inapposite to this case.

In the case *sub judice*, we hold that the Kentucky General Assembly acted within its power to enact a law that serves a very important public policy purpose. Without tax revenue, our government would screech to a grinding halt. It is imperative that the citizens of this Commonwealth pay their fair share to provide the Commonwealth with the means to provide essential government services. Without tax revenue, our schools, our roads, and indeed even our public safety would be seriously jeopardized. Therefore, it is equally imperative that the Commonwealth has the means to effectively enforce its tax liens.

With this underlying policy in mind, the legislature created the machinery for collection of its taxes—KRS 134.420(2)—and provided those tax liens priority over subsequent holders of security interests, including purchase money lenders. As the *Vanderkraats* court noted, lenders can protect themselves against what they consider to be an unjust result by requiring that the tax liens are satisfied before lending money for the purchase of the property. *See Vanderkraats,* 899 S.W.2d at 511. Alternatively, the lender can choose not to lend.

Accordingly, we hold that the plain language of KRS 134.420(2) and (4) establishes that a tax lien created and filed in accordance with those sections enjoys a priority over all subsequent purchasers, judgment lien creditors, security interest holders, and mechanic's lien creditors.

### c. *Equitable Subrogation*

■ Kentucky common law recognizes an equitable "exception" to the "first in time, first in right" rule, known as the doctrine of equitable subrogation. This Court's predecessor long ago recognized the doctrine of equitable subrogation. *Louisville Joint Stock Land Bank v. Bank of Pembroke,* 225 Ky. 375, 9 S.W.2d 113 (1928). However, Kentucky courts have rarely addressed the specifics of the doctrine, and we therefore draw upon cases from other jurisdictions. Equitable subrogation permits a creditor who pays the debt of another to stand in the shoes of the original creditor, enjoying all rights and remedies of the original creditor. In essence, "[t]he doctrine allows a later-filed lienholder to leap-frog over an intervening lien and take a priority position." *Hicks v. Londre,* 125 P.3d 452 (Colo.2005). This

doctrine, however, "is a creature of equity, and rests upon principles of natural justice." *Id.* at 114.

■■■■ A party seeking to invoke the doctrine of equitable subrogation bears the burden of proving the applicability of the doctrine. "Although [equitable] subrogation is a highly favored doctrine, it is not an absolute right, but rather, one that depends on the equities and attending facts and circumstances of each case." *Universal Title Ins. Co. v. U.S.,* 942 F.2d 1311, 1315 (8th Cir.1991). "Subrogation cannot be invoked where it would violate sound public policy, or result in harm to innocent third parties." *Ripley v. Piehl,* 700 N.W.2d 540, 545 (Minn.App.2005) (citing *Universal Title,* 942 F.2d at 1315). "It is axiomatic that as an equitable doctrine, subrogation 'aids the vigilant, and not the negligent.'" *Ripley,* 700 N.W.2d at 545 (quoting *Sinell v. Sharon,* 206 Minn. 437, 289 N.W. 44, 46 (1939)).

Courts across the United States have developed three approaches for determining whether to apply equitable subrogation when a third party holds a lien on the property at the time a second lender pays off the principal encumbrance. *See Louisville/Jefferson Co. Office for Econ. Develop. v. Manufacturers and Traders Trust Co.,* 2004 WL 259083, *2 (Feb. 13, 2004) (Ky.App.) (hereinafter, "*LEDCO*") (citing *Houston v. Bank of America Fed. Savings Bank,* 119 Nev. 485, 78 P.3d 71 (2003)).

The majority of courts addressing the issue find that actual knowledge of an existing lien precludes the application of the doctrine of equitable subrogation, but constructive knowledge does not. *See, e.g., United Carolina Bank v. Beesley,* 663 A.2d 574 (Me.1995); *United States v. Baran,* 996 F.2d 25 (2d Cir.1993) (applying New York law); *Dietrich Indus., Inc. v. United States,* 988 F.2d 568, 572 (5th Cir.1993) (applying Texas law); *Brooks v. Resolu-*

*tion Trust Corp.,* 599 So.2d 1163, 1165 (Ala.1992). Critics of the majority approach contend that it fosters deliberate ignorance by encouraging lenders to forego title searches so that they might later claim the absence of actual knowledge of existing liens.

Under the second approach, equitable subrogation is barred where the subsequent lienholder has actual or constructive knowledge of an existing lien. *See, e.g. Harms v. Burt,* 30 Kan.App.2d 263, 40 P.3d 329, 332 (2002). Some have criticized this approach as obviating the doctrine completely.

The final approach, which has been adopted by the *Restatement (Third) of Property,* allows a court the discretion to disregard both actual and constructive knowledge of a prior lien if the junior lienholder is not prejudiced by the court's reordering of priorities. *See East Boston Savings Bank v. Ogan,* 428 Mass. 327, 701 N.E.2d 331 (1998). The rationale for the Restatement's approach "is that the junior lienholder suffers no actual prejudice (i.e., no change in position) by the mere substitution of the first lienholder—except to the extent that more money is borrowed and the security raised." *LEDCO,* 2004 WL 259083 at *2.

■■■■ As it relates to mortgage lenders, this Court concludes that a balancing of the equities favors the second approach. In doing so, the Court observes that equity demands that sophisticated businesses, like professional mortgage lenders, should be held to a higher standard for purposes of determining whether the lender acted under a justifiable or excusable mistake of fact in failing to duly investigate prior liens. *Ripley v. Piehl,* 700 N.W.2d 540, 545 (Minn.App.2005), *review denied,* 2005 Minn. LEXIS 630 (Minn. Oct. 18, 2005). *See also Universal Title,* 942 F.2d at 1317

(8ᵗʰ Circuit Court of Appeals noting that "Minnesota courts impose stricter standards on professionals than lay persons in assessing whether mistakes are 'excusable' for purposes of the doctrine of legal subrogation.")

■ Equity also demands that the responsibility for a defective title examination be allocated to the party who is most culpable. *See First Federal Savings Bank of Wabash v. United States,* 118 F.3d 532 (7th Cir.1997). In *First Federal,* the 7ᵗʰ Circuit addressed the question of whether a lender who advances funds for a refinancing, but misses an intervening tax lien because of the negligence of its title insurer, can rely upon the doctrine of equitable subrogation to reorder the priorities of the liens. The court noted that:

> It is ... not obvious at first glance where the equities lie. On the one hand, although it may be imprecise to characterize the government's elevation to first lienholder as a windfall, it is true that applying equitable subrogation would not make the government worse off than it was prior to the release of the first mortgage.

*Id.* at 534. "[A]s a sophisticated lender with no use for the mortgaged property other than as collateral, [the Lender] was able to obtain title insurance to contract against the risk of errors such as the one that occurred here." Thus, "the title insurer, whose negligence apparently caused this mess in the first place, presumably must bear the loss...." *Id.*

Other courts have also been reluctant to apply the doctrine of equitable subrogation to bail out a negligent title insurer. *See Lawyers Title Ins. Corp. v. Capp,* 174 Ind. App. 633, 369 N.E.2d 672, 674 (1977). The *Lawyers Title* court, echoing the Washington Supreme Court, aptly stated its position with regard to title insurance companies: "Either they insure or they don't. It is not the province of the court to relieve a title insurance company of its contractual obligation." *Id.* (quoting *Coy v. Raabe,* 69 Wash.2d 346, 418 P.2d 728 (1966) (internal quotations omitted)).

■ The Court finds this reasoning persuasive. The equities favor holding the most culpable party responsible for the loss. In this case, the most responsible party is not a party to the case. However, the Court presumes that both lending institutions involved in this case have viable claims against their respective title insurance companies. Those title insurers are engaged in the very profitable business of assuring that their lending institution customers receive a clear title by insuring such. If the title insurer's examiners bungle the title search, no matter how innocent the mistake might be, then the title insurers must ultimately be held liable. To parrot the *Lawyers Title* court, "Either they insure or they don't." Accordingly, this Court holds that the equities weigh against applying the doctrine of equitable subrogation in cases where the title insurers fail to identify properly recorded liens.

■ In this case, Central Bank's title examiner clearly missed the intervening tax lien that was filed by the Commonwealth before Central Bank lent funds to refinance the Foster Property. Central Bank characterizes the missed lien as an "innocent mistake" for which it should not be punished. *See* Central Bank's Brief for Appellant (incorrectly styled as Brief for Appellee) at pp. 9, 14 and Central Bank's Reply Brief at p. 4 (incorrectly styled as Reply Brief for Appellee). However, whether something is an "innocent mistake" or "actionable negligence" is usually in the eye of the beholder.

■ Indeed, the professional lender, not the Commonwealth or other lawful lien holders, chooses its own title examiner and

procures "title insurance" (usually at the expense of the borrower no less) to guarantee that the title is free of defects. If the professional lender chooses, by necessity or by mistake, to lend in spite of a cloudy title, the professional lender shall bear the risk that the borrower will default before the end of the loan term. To hold otherwise, would be to ignore the principles of equity upon which the doctrine was constructed.

■ A purchase money mortgage, like that upon which Wells Fargo seeks recovery, presents a host of different concerns. Simply stated, a purchase money mortgage is different than a refinancing in that the proceeds advanced by the lender are used to purchase the mortgaged property. The Restatement (Third) of Property offers a more thorough explanation:

> In real estate transactions, it is common for a vendor of real estate to convey title to the purchaser, receive part of the purchase price in cash, and take back a mortgage on the real estate to secure a promissory note for the balance of the purchase price. Such a mortgage is frequently referred to as a "vendor purchase money mortgage." In an alternative and more common form of the transaction, third party institutional financing is used to "cash out" the vendor. In this situation, the vendor receives part of the purchase price in cash from the purchaser and the balance in cash from a third party lender who takes the purchaser's promissory note secured by a mortgage on the purchaser's newly acquired real estate. This type of mortgage is usually termed a "third party purchase money mortgage." Some land transactions utilize both types of purchase money mortgages. This section focuses on the priority accorded purchase money mortgages of either type over other liens or claims arising through the purchaser that antedate the purchase money transaction, and also on the priority relationship between the two types of purchase money mortgages.

*Restatement (Third) of Property: Mortgages,* Section 7.2 cmt. a (1997).

It is true that many jurisdictions elevate purchase money mortgage liens to the detriment of all other lien holders. *See id.* at Reporter's Notes (citing *Belland v. O.K. Lumber, Inc.,* 797 P.2d 638 (Alaska 1990); *Sunshine Bank of Fort Walton Beach v. Smith,* 631 So.2d 965 (Ala.1994); *Garrett Tire Ctr., Inc. v. Herbaugh,* 294 Ark. 21, 740 S.W.2d 612 (1987); *Mercantile Collection Bureau v. Roach,* 195 Cal.App.2d 355, 15 Cal.Rptr. 710 (1961); *County of Pinellas v. Clearwater Fed. Sav. & Loan Ass'n,* 214 So.2d 525 (Fla.Dist.Ct.App.1968); *Associates Discount Corp. v. Gomes,* 338 So.2d 552 (Fla.Dist.Ct.App.1976); *Aetna Casualty & Sur. Co. v. Valdosta Fed. Sav. & Loan Ass'n,* 333 S.E.2d 849 (Ga.Ct.App. 1985); *Liberty Parts Warehouse, Inc. v. Marshall County Bank,* 459 N.E.2d 738 (Ind.Ct.App.1984); *Midland Savings Bank FSB v. Stewart Group,* 533 N.W.2d 191 (Iowa 1995); *Resolution Trust Corp. v. Bopp,* 18 Kan.App.2d 271, 850 P.2d 939 (1993); *Hill v. Hill,* 185 Kan. 389, 345 P.2d 1015 (1959); *Libby v. Brooks,* 653 A.2d 422 (Me.1995); *Stewart v. Smith,* 36 Minn. 82, 30 N.W. 430 (1886); *Commerce Sav. Lincoln, Inc. v. Robinson,* 213 Neb. 596, 331 N.W.2d 495 (1983); *Fleet Mortgage Corp. v. Stevenson,* 241 N.J.Super. 408, 575 A.2d 63 (1990); *Slate v. Marion,* 104 N.C.App. 132, 408 S.E.2d 189 (1991), *review denied,* 330 N.C. 442, 412 S.E.2d 75 (1991); *Giragosian v. Clement,* 199 A.D.2d 656, 604 N.Y.S.2d 983 (1993); *Hursey v. Hursey,* 284 S.C. 323, 326 S.E.2d 178 (S.C.App. 1985); *United States v. Dailey,* 749 F.Supp. 218 (D.Ariz.1990); *Royal Bank of Canada v. Clarke,* 373 F.Supp. 599 (D.Vi. 1974)). Some jurisdictions, however, grant

purchase money security interests a super priority via statute. *See, e.g.,* West's Ann. Cal. Civ.Code § 2928; 42 Pa. Stat. § 814(1). Without the advanced funds, the purchaser ordinarily would not be able to acquire the property.

Wells Fargo correctly notes that we have previously allowed a purchase money security interest created pursuant to Kentucky's UCC Article 9 to defeat a prior-filed general tax lien. *See Whayne Supply Co., Inc. v. Commonwealth of Kentucky Revenue Cabinet,* 925 S.W.2d 185 (Ky. 1996). In *Whayne Supply,* however, our holding hinged upon the fact that the Kentucky General Assembly had provided a "super-priority" to Article 9 purchase money security interests with the enactment of KRS 355.9–312(4). Yet, there is no specific statute that grants a purchase money mortgage holder a similar super-priority. Therefore, we believe our holding in *Whayne Supply* is distinguishable from the present case.

Wells Fargo also urges us to adopt the rule contained in the Restatement (Third) of Property: Mortgages, Section 7.2. Subsection (b) provides that: "A purchase money mortgage, whether or not recorded, has priority over any mortgage, lien, or other claim that attaches to the real estate but is created by or arises against the purchaser-mortgagor prior to the purchaser-mortgagor's acquisition of title to the real estate." Such a bright line rule, however, would ignore the equities of each individual case, a rather important consideration when determining whether or not to apply the doctrine of *equitable* subrogation.

As it relates to Wells Fargo's predecessor in interest, The Provident Bank, it is without dispute that The Provident Bank either missed or ignored the lien altogether. As Wells Fargo admits in its brief, had the lender been required to satisfy the Commonwealth's tax lien, "in all likelihood [the lender] never would have made the loan." Wells Fargo's Brief for Appellant at p. 8. Indeed, these are the sound lending practices that our society deserves, especially in the aftermath of this nation's 2008 financial meltdown.

■ The liens in both cases could have been easily discovered with due diligence. The Commonwealth's liens would rarely be satisfied if a lender were allowed to overlook the lien—either by inadvertence, negligence or incompetence. Notably, the lenders are not without a remedy in this situation; presumably, the lenders may seek recompense from the title examiner's errors and omissions insurance carrier. Accordingly, we hold today that a professional lender who has actual or constructive knowledge of an earlier recorded general tax lien may not benefit from an equitable reordering of the liens.

## III. CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Appeals, and remand these matters to the respective Circuit Courts for such further proceedings as are consistent with this opinion.

MINTON, C.J.; CUNNINGHAM, SCHRODER, SCOTT and VENTERS, JJ., Special Justice ROBERT L. ELLIOTT, sitting. All concur. ABRAMSON and NOBLE, JJ., not sitting.