MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., Appellant,

v.

Joseph ROBERTS, Appellee.

No. 2010–SC–000069–DG.

Supreme Court of Kentucky.

May 24, 2012.

Thomas Morgan Ward, Jr., Bethany A. Breetz, Chadwick Aaron McTighe, Stites & Harbison, PLLC, Louisville, KY, Counsel for Appellant.

Kenneth S. Kasacavage, Henderson, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

This case presents the question whether the doctrine of equitable subrogation may be used to reorder the priority of a mortgage lien where the mortgage holder had constructive but not actual knowledge of a pre-existing lien when it paid off an earlier mortgage as part of a refinancing deal and there was no fraud or other misconduct that would have prevented the discovery of the lien. The trial court applied the doctrine to reorder the priority of liens, and the Court of Appeals reversed, finding that the doctrine did not apply under the facts

of this case. Because equitable subrogation is not available to a lienholder who has actual or constructive knowledge of a preexisting lien, the Court of Appeals was correct that the remedy was not available to the Appellant in this case, Mortgage Electronic Registration Systems, Inc. (MERS). For that reason, this Court affirms.

## I. Background

Jeffrey and Mary Michael purchased real property located at 6515 Tandy Lane in Henderson, Kentucky, on November 5, 1993. The Michaels refinanced the property three times in the next few years: in April 1994, August 1994, and December 1996. Each time they secured notes in increasingly greater amounts.

On August 26, 1998, the Michaels again refinanced, granting a mortgage on the property to The Money Store Home Equity Corporation in the amount of $108,000. The Money Store's mortgage was correctly recorded.

On June 28, 2000, Joseph Roberts recorded a judgment lien of $25,894.63 against the Michaels' property. There is no dispute that, at that time, The Money Store's mortgage was superior to Roberts' lien.

On September 18, 2003, the property was mortgaged for $125,800 to New Century Mortgage Corp. The proceeds of the New Century loan were used to pay off the 1998 mortgage held by The Money Store, which was then released of record. The New Century mortgage was recorded on October 7, 2003.

The New Century mortgage was assigned to Mortgage Electronic Registration Systems, or MERS,[1] in late September 2003. The assignment of the mortgage to MERS was not recorded until March 22, 2004.

MERS filed a foreclosure action against the Michaels on May 17, 2004. Because of his judgment lien, Roberts was also named as a defendant. He filed an answer, counterclaim, and cross-claim, arguing that his judgment lien had priority over MERS's mortgage because it was filed first.

The circuit court entered summary judgment in favor of MERS. The court applied the doctrine of equitable subrogation to reorder the priority of the liens, holding that MERS had priority over Roberts to the extent of The Money Store's 1998 mortgage. The court ordered the property to be sold, with the proceeds to go first to MERS up to the amount of $89,584.36,[2] then to Roberts up to the amount of $25,894.63, and then to any other liens.

The Court of Appeals reversed, holding that the doctrine of equitable subrogation did not apply in this case. This Court accepted discretionary review.

## II. Analysis

The question before the Court is simply who has first priority: Roberts, because his judgment lien was filed before MERS's mortgage lien, or MERS, because of equitable subrogation.

### A. Statutory Scheme.

■ Kentucky is a race-notice jurisdiction. *See* KRS 382.270–.280. In order to have first priority, "one must not only be the first to file the mortgage, deed or deed

---

1. MERS is an organization that receives assignments of mortgages to facilitate real estate transactions. It does not itself purchase mortgages, but instead acts as a nominee for the lender and acts as a clearing house for mortgages.

2. This was the amount paid by New Century to satisfy The Money Store's mortgage.

of trust, but the filer must also lack actual or constructive knowledge of any other mortgages, deeds or deeds of trust related to the property." *Wells Fargo Bank, Minnesota, N.A. v. Commonwealth, Finance and Administration, Department of Revenue*, 345 S.W.3d 800, 804 (Ky.2011). Put another way, a prior interest in real property takes priority over a subsequent interest that was taken with notice, actual or constructive, of the prior interest.

There is no dispute that Roberts would have first priority if the recording statutes apply. Roberts' judgment lien was properly recorded more than three years before the New Century mortgage was granted and recorded. Because Roberts' lien was properly recorded and thus could have been discovered in the course of a title search, New Century had at least constructive notice of Roberts' lien. (The record is silent on whether New Century had actual notice of Roberts' lien.) Thus, under the statute, New Century's interest would have been subordinate to Roberts'. Accordingly, as the assignee of New Century, MERS's interest would also be subordinate to Roberts'.

### B. Equitable Subrogation.

■ MERS argues that the judicially created doctrine of equitable subrogation should apply in this case to overcome a strict application of the recording statutes. "Equitable subrogation permits a creditor who pays the debt of another to stand in the shoes of the original creditor, enjoying all rights and remedies of the original creditor." *Wells Fargo*, 345 S.W.3d at 806. If the doctrine applies in this case, New Century would be considered to have stepped into the priority shoes of The Money Store by providing the refinancing that paid off The Money Store's 1998 mortgage in full. MERS, the assignee of New Century's mortgage, would therefore have priority over Roberts' lien.

The Court of Appeals noted that Kentucky long ago recognized the doctrine of equitable subrogation in the mortgage context in *Louisville Joint Stock Land Bank v. Bank of Pembroke*, 225 Ky. 375, 9 S.W.2d 113 (1928), but distinguished the facts of that case from the present case. In so doing, the court held that equity could not support application of the doctrine of equitable subrogation in the present case because MERS and its predecessor had lost priority purely because of lack of diligence.

After the Court of Appeals handed down its opinion in this case, this Court addressed the doctrine of equitable subrogation in *Wells Fargo Bank, Minnesota, N.A. v. Commonwealth, Finance and Administration, Department of Revenue*, 345 S.W.3d 800 (Ky.2011), a case dealing with the priority of tax liens. This Court considered three possible approaches for determining whether equitable subrogation is available. Under the first approach, which is the majority approach, equitable subrogation is barred if the subsequent lienholder has actual knowledge of the existing lien, but not if the subsequent lienholder only has constructive knowledge. *Id.* at 807 (citing, among others, *United Carolina Bank v. Beesley*, 663 A.2d 574 (Me.1995)). Under the second approach, either actual or constructive knowledge of the existing lien precludes application of the doctrine of equitable subrogation. *Id.* (citing *Harms v. Burt*, 30 Kan.App.2d 263, 40 P.3d 329, 332 (2002)); *see also, e.g., Independence One Mortgage Corporation v. Katsaros*, 43 Conn.App. 71, 681 A.2d 1005 (1996). Under the third approach, which is the approach adopted by the *Restatement (Third) of Property*, a court has "the discretion to disregard both actual and constructive knowledge of a prior lien if the junior lienholder is not prejudiced by the court's reordering of priorities." *Wells*

*Fargo,* 345 S.W.3d at 807; *see, e.g., Houston v. Bank of America Federal Savings Bank,* 119 Nev. 485, 78 P.3d 71, 74–75 (2003).

In *Wells Fargo,* the Court adopted the second approach, holding that equitable subrogation is barred if the subsequent lienholder has actual *or* constructive knowledge of the existing lien. 345 S.W.3d at 807.

In this appeal, MERS asks this Court to reconsider the holding in *Wells Fargo* because, MERS argues, it ignored Kentucky precedent as well as important policy concerns. If the Court declines to overturn *Wells Fargo,* MERS asks the Court to limit its holding to the context of tax liens and to provide an alternate rule for equitable subrogation for judgment liens and other types of liens.

*1.* **Wells Fargo** *did not ignore relevant Kentucky precedent.*

MERS argues that this Court's opinion in *Wells Fargo* ignored *Louisville Joint Stock Land Bank,* the 1928 case that recognized the doctrine of equitable subrogation in Kentucky under facts somewhat similar to those in the present case. In *Louisville Joint Stock Land Bank,* the Court applied equitable subrogation to give first priority to a lender, Louisville Joint Stock Land Bank ("Land Bank"), that had taken a new mortgage and paid off a first mortgage in full, despite the existence of a second mortgage with the Bank of Pembroke that had been granted and properly recorded before the Land Bank had any interest in the property. 9 S.W.2d. at 116. Even though the Land Bank had *constructive* knowledge of the second mortgage, because the second mortgage was properly recorded and thus readily discoverable, the Court reasoned that equitable subrogation was available because the second lienholder, the Bank of Pembroke, would not be harmed by reor-

dering the priority. *Id.* The Bank of Pembroke would remain in the exact same position it expected to be when it took the mortgage. *Id.* And equity demanded reordering because the owner of the mortgaged farm had fraudulently concealed the existence of the second mortgage from the Land Bank. *Id.* at 115.

As an initial matter, the facts of *Louisville Joint Stock Land Bank* are clearly distinguishable from the present case. In the 1928 case, the Bank of Pembroke had an agreement with the landowner that it would subordinate its mortgage to the new mortgage acquired by the Land Bank. *Id.* at 114. The landowner signed an affidavit that untruthfully stated that there was no prior or superior lien to that of the Land Bank. *Id.* And there was even some suggestion that an employee of the Bank of Pembroke had been involved in concealing the existence of the prior lien from the Land Bank; the cashier at the bank who initially advised the landowner to take out a second mortgage later notarized a mortgage document that untruthfully stated that the Land Bank's lien was a first lien. *Id.* Given the unusual facts in *Louisville Joint Stock Land Bank,* it can easily be distinguished from the present case, in which there is no evidence that Roberts agreed to subordinate his lien to a new mortgage, and no suggestion of fraud by any party.

However, the opinion in *Louisville Joint Stock Land Bank* went beyond the specific facts of the case by describing a general rule for when equitable subrogation is available. Because this rule conflicts in some ways with the approach adopted in *Wells Fargo,* this Court will explain why the 1928 rule is no longer applicable. *Louisville Joint Stock Land Bank* stated the rule for when equitable subrogation is available in this way:

We are of the opinion that the rule, supported both by reason and by authority, is to the effect that, when the holder of a first mortgage takes a new mortgage as a substitute therefor and releases the original mortgage, in ignorance of an intervening lien upon the mortgaged premises, and especially if the release is induced by fraud or misrepresentation on the part of the mortgagor, equity will, in the absence of laches or other disqualifying fact, restore and reinstate the lien of the first mortgage and give it its original priority. The rule is, of course, subject to the limitation or qualification that, by restoring the discharged lien, the holder of the junior encumbrance must not be placed in a worse position than he would have occupied had the senior encumbrance not been released.

*Id.* at 116. To summarize the approach in *Louisville Joint Stock Land Bank,* equitable subrogation would be available if the lender lacked actual knowledge of an intervening lien, the junior lienholder was not put in a worse position, and there was an equity concern (such as fraud) that demanded reordering of priorities.

MERS argues that this Court did not fully consider the precedent of *Louisville Joint Stock Land Bank* in the decision in *Wells Fargo.* It asks this Court to readopt the rule in *Louisville Joint Stock Land Bank* and to apply it to the facts of this case to find that equitable subrogation is available in this case.

The rule in *Louisville Joint Stock Land Bank* would potentially be more favorable to MERS's claim because it would allow equitable subrogation even in some situations in which the lender had constructive knowledge of the existing lien. Under the *Wells Fargo* rule, equitable subrogation is simply not available if the lender has constructive knowledge of the existing lien.

(Of course, even under the more liberal rule, MERS's equity claim would be weaker than the Land Bank's claim in *Louisville Joint Stock Land Bank* because in the present case there is no suggestion of any fraudulent activity by either the landowners or the existing lienholder.)

However, MERS is not correct in its argument that this Court did not properly consider *Louisville Joint Stock Land Bank* in reaching the decision in *Wells Fargo.* In *Wells Fargo,* the Court cited *Louisville Joint Stock Land Bank* as the case that recognized the doctrine of equitable subrogation in Kentucky. *See Wells Fargo,* 345 S.W.3d at 806. But the opinion noted that there was no clear rule on the doctrine in Kentucky: "Kentucky courts have rarely addressed the specifics of the doctrine, and we therefore draw upon cases from other jurisdictions." *Id.* As we recognized implicitly in *Wells Fargo, Louisville Joint Stock Land Bank* simply does not have the precedential value that MERS claims because it has had very limited application in Kentucky cases.

*Louisville Joint Stock Land Bank* seems to have had little or no influence after 1940. After being cited several times in the twelve years after it was handed down in 1928, *e.g., Federal Land Bank of Louisville v. Marvin,* 228 Ky. 242, 14 S.W.2d 762 (1929); *Maryland Casualty Company v. Walker,* 257 Ky. 397, 78 S.W.2d 34 (1934); *Southern Exchange Bank v. American Surety Company of New York,* 284 Ky. 251, 144 S.W.2d 203, 204 (1940), it was not cited again by any Kentucky appellate court until 2004, when the Court of Appeals cited it in an unpublished decision. *See Louisville/Jefferson County Office for Economic Development v. Manufacturers and Traders Trust Company,* No. 2003–CA–000010–MR, 2004 WL 259083, at *2 (Ky.App. Feb. 13, 2004). Rather than citing *Louisville Joint Stock*

*Land Bank* for its account of how equitable subrogation works, the Court of Appeals cited it merely for the proposition that "[t]he doctrine of equitable subrogation has long been recognized in Kentucky." *Id.* The Court of Appeals did not view the case as having any precedential value for determining when the doctrine would apply, and instead considered modern national trends to decide the issue. *Id.*

Thus, the one time a Kentucky appellate court addressed this issue, it did not find the rule in *Louisville Joint Stock Land Bank* to be controlling. The parties have not cited, and this Court has not located, any other cases prior to *Wells Fargo* about equitable subrogation in the mortgage context that would provide a clear rule on when the doctrine is available in Kentucky. This Court was correct to approach the issue as a novel question of law in *Wells Fargo* and to conduct an analysis of the wisdom of the competing approaches, as there was no clear rule in Kentucky. We now make explicit what was implied in *Wells Fargo:* the application of equitable subrogation in *Louisville Joint Stock Land Bank* is not the law in Kentucky, and to the extent the case conflicts with *Wells Fargo* and with this opinion, it is overruled.

**2. *The* Wells Fargo *approach promotes the intent and goals of Kentucky's recording statutes, and it is not limited to tax liens.***

MERS also asks this Court to reconsider *Wells Fargo* because of the policy implications of adopting a rule that a lender's actual *or* constructive knowledge bars equitable subrogation.

MERS argues that this rule fails to serve the underlying purpose of equitable subrogation, which is to prevent unjust enrichment at another's expense. MERS argues that if the Court of Appeals' decision stands, Roberts will have received an "unearned windfall" merely because of New Century's (and MERS's) mistake in running the title searches. *Bank of New York v. Nally,* 820 N.E.2d 644, 653 (Ind. 2005). But what will happen in this case is not a true "windfall." Certainly, Roberts will *benefit* by gaining first priority. It becomes more likely that he will receive the full amount of his $25,894.63 judgment against the homeowners when the property is sold, because the proceeds will go to pay his lien first. But he will only get exactly what he is already entitled to: the amount of the judgment. And it is inaccurate to claim, as MERS does, that this course of events causes Roberts to get something better than what he expected when he placed the lien on the property. When Roberts recorded the judgment lien in June 2000, his expectation was that he would have second priority to The Money Store's mortgage, but that he would have superior priority to *all subsequent interests.* New Century could have obtained a subordination agreement from Roberts, but it did not (apparently because it failed to locate Roberts' lien by doing a proper title search). And so Roberts moved into first priority. This is not a windfall; it is the way a race-notice recording scheme works.

It is necessary to protect the accuracy and efficiency of the recording system in Kentucky. As the Court of Appeals noted, "The recording statutes provide an orderly system that gives notice to those who seek to secure a subsequent interest in the property and for a sequential method of payment of the obligor's debts." Kentucky's recording statutes lay out a clear system for recording and ordering liens on a piece of real property, and any deviation from the system should be approached cautiously.

This Court is required to give full effect to the purpose of these statutes: "All statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature...." KRS 446.080. The rule in *Wells Fargo* meets this requirement because it allows equitable subrogation only in the relatively rare cases in which the subsequent lender has neither actual nor constructive notice of the existing lien. As an example, equitable subrogation would be available under the *Wells Fargo* approach if a party committed fraud such that the existing lien could not be located even by doing a proper title search. *See State Savings Trust Company v. Spencer*, 201 S.W. 967 (Mo.Ct.App.1918) (allowing subrogation when the borrower forged a subordination document and caused marginal satisfaction to be entered on the record of the deed). In such an instance, when the fraud is such that it is impossible to know a prior lien existed, the party had no actual or constructive knowledge. While the *Wells Fargo* rule means that equitable subrogation will rarely be available, the rule ensures that full effect is given to the intent and objects of the recording statutes. The statutory scheme will be overridden by the judicially created doctrine of equitable subrogation only in those rare circumstances in which equity truly requires it.

The importance of preserving the recording scheme also demonstrates why the rule in *Wells Fargo* should not be limited to cases involving tax liens. MERS argues that there is more justification for a narrow application of equitable subrogation in the tax lien context because collecting taxes is essential to the government's ability to provide services.

It is of course true that tax liens and judgment liens serve different purposes. But the difference between the two types of liens is not relevant when the primary question is whether the subsequent lender has proceeded in a manner that preserves the accuracy and order of the recording scheme. When a lender conducts a proper title search and locates existing liens, the recording scheme contemplates the lender addressing the liens in the appropriate manner. For example, the lender could satisfy the lien or obtain a subordination agreement from the intervening lienholder. These are the proper, usual mechanisms for reordering priority. Here, the lender has failed to do a proper title search and has not addressed the existing lien using one of the usual methods, but it nevertheless asks the courts to step into the normal workings of the recording statutes to reorder priority. Doing so in any but the most limited circumstances fails to fulfill our mandate to liberally construe the recording statutes with a view to promoting their objects and carrying out the intent of the legislature. KRS 446.080.

### 3. The economic-policy concerns raised by MERS do not necessitate a departure from the *Wells Fargo* rule.

■ MERS presents economic arguments that a more liberal approach to equitable subrogation would have positive effects for homeowners. MERS argues that the Restatement approach would facilitate refinancing and thus, in theory, stem the threat of foreclosure.[3] MERS also asserts that the Restatement approach could reduce lending costs. If equitable subrogation is readily available, MERS argues, there will be less need for title insurance, the cost of which is usually covered

---

**3.** Here, as the Court of Appeals pointed out, refinancing did not have this desired effect. The property was refinanced in September 2003 and a foreclosure action was filed in May 2004. At best, the refinancing staved off foreclosure for just a few months.

by homeowners. With broad application of equitable subrogation, the title insurance requirement could be made less expensive or even eliminated completely, according to MERS's argument. *See* Grant S. Nelson & Dale A. Whitman, *Adopting Restatement Mortgage Subrogation Principles: Saving Billions of Dollars for Refinancing Homeowners*, 2006 BYU L.Rev. 305, 313–14 (2006).

Some courts have taken into account the potential economic impacts on refinancing and title insurance that MERS describes. *E.g., Bank of America, N.A. v. Prestance Corporation*, 160 Wash.2d 560, 160 P.3d 17, 28 (2007) (adopting the Restatement approach in part because of these policy considerations). This Court declines to do so. The mortgage industry is extremely large and complex, and it has undergone enormous changes during the recent economic downturn. Courts are generally not equipped to evaluate broad-reaching economic concerns such as MERS's claims about the long-term, indirect effects on foreclosure rates and lending costs. That kind of analysis is more properly and effectively done by the legislature. *Cf. Woods v. Commonwealth*, 142 S.W.3d 24, 45 (Ky.2004) (recognizing that the legislature is better suited to evaluate certain complex issues). The legislature has the option of addressing these long-terms effects by creating an exception to the recording statutes for mortgage refinancing situations.

For these reasons, this Court finds that the equity and economic-policy claims made by MERS do not necessitate a departure from the *Wells Fargo* rule.

*4. The identity of the lender is not relevant to whether equitable subrogation is available.*

 MERS properly criticizes this Court's opinion in *Wells Fargo* for some of its language focusing on professional lend-ers. *See, e.g., Wells Fargo,* 345 S.W.3d at 807 ("[T]he Court observes that equity demands that sophisticated businesses, like professional mortgage lenders, should be held to a higher standard....."). Much of the language in *Wells Fargo* that was directed at professional mortgage lenders expressed frustration that some of these companies appeared to disregard the need to conduct proper title searches, *id.* at 808–09, and that they had failed to adhere to "sound lending practices," *id.* at 810.

As discussed above, the purpose behind adopting a narrow rule of applicability for equitable subrogation is to protect the Kentucky recording scheme and to ensure a clear and organized means of recording and ordering liens on a piece of real property. The identity of the lender is not truly relevant to whether the purposes of the recording statutes are being promoted, and thus it is not relevant to whether equitable subrogation is available. Although this case, like *Wells Fargo*, involves professional lenders, we take this opportunity to clarify that the approach adopted in *Wells Fargo* applies equally to all lienholders.

### III. Conclusion

For the foregoing reasons, this Court affirms.

All sitting. All concur.