RENDERED: FEBRUARY 6, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0550-MR

FIRST STATE BANK OF THE
SOUTHEAST, INC.                                                    APPELLANT


                        APPEAL FROM FAYETTE CIRCUIT COURT
v.                      HONORABLE THOMAS L. TRAVIS, JUDGE
                        ACTION NO. 23-CI-03478


SUDHARSSAN JAGANNATHAN;
SUJATHA SANTHANAM;
MAYNARD BUILDERS, INCORPORATED;
EAST POINT HOMEOWNERS
ASSOCIATION, INCORPORATED;
SOUTHERN STATES GEORGETOWN
CO-OP, INCORPORATED; FAYETTE
COUNTY ATTORNEY'S OFFICE;
KENTUCKY DEPARTMENT OF
REVENUE; MICHELLE O'KEEFE;
AND JAY TAYLOR                                                      APPELLEES


OPINION
AFFIRMING IN PART AND
REVERSING AND REMANDING IN PART

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; COMBS AND ECKERLE, JUDGES.

ECKERLE, JUDGE:  Appellant, First State Bank of the Southeast, Inc. ("FSB"), seeks reversal of a summary judgment by the Fayette Circuit Court granting the primary Appellees, Sudharssan Jagannathan and Sujatha Santhanam (collectively "Jagannathan"), an award of $105,872, which represents the amount of proceeds currently held in escrow remaining from a foreclosure sale of certain real property. The Circuit Court based its judgment on the premise that FSB's recorded mortgage – which otherwise could have entitled FSB to some or all of those proceeds – was inferior in priority to an unrecorded, equitable lien held by the Jagannathan.  After careful review and for the reasons discussed below, we affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The Circuit Court summarized the procedural background and most of the relevant undisputed facts of this matter as follows:

> This action began as a foreclosure case, with the Plaintiff FSB bringing suit to collect on a defaulted promissory note for a loan it made to Maynard Builders, Inc. ("Maynard") and secured by the real property located at 2425 Lorenzo Way.  On July 15, 2021, FSB properly perfected its security interest by recording its mortgage with the county clerk.  There is no dispute about the validity and priority of FSB's lien on the real property, with the exception of the claims by Jagannathan.

-2-

The defendants named in this case are those who have/had a potential interest in the subject property. Maynard, as the primary defendant, was properly served, but failed to file any responsive pleading to the Complaint and was held in default on May 24, 2024. Southern States Georgetown Co-Op, Inc., a party with a possible interest, is also in default. The Plaintiff has obtained a favorable summary judgment against East Point Homeowners Association, Inc., Michelle O'Keefe, and Jay Taylor. The outstanding amounts owed in this matter due to any tax liens have also been satisfied. Jagannathan filed an Answer, whereby they asserted a Counterclaim against FSB, asserting that they hold a valid judgment lien on the property, and that such lien relates back to be prior and superior by virtue of an "equitable lien" interest in the property. This judgment lien was subsequently recorded on June 13, 2023. Jagannathan and Santhanam are the only two active defendants remaining in this action.

The real property in question was owned by Maynard and is located at 2425 Lorenzo Way. It was sold on June 24, via judicial sale by the Master Commissioner for $452,550. Thereafter, $343,264.53 was distributed to FSB, with the parties agreeing to hold back the remaining $105,872. Such amount is still being retained in an escrow account awaiting a ruling on the present matter. FSB claims to be entitled to all the proceeds in order to fully satisfy its mortgage lien of $438,295.28.

The dispute over the remaining $105,872 centers on Jagannathan's equitable lien claim to those proceeds. That claim arises from a contractual agreement between Maynard and Jagannathan for the construction of a residential home on the same lot/property located at 2425 Lorenzo Way. Maynard apparently had an unusual business practice whereby it would first contract with the prospective purchaser to build a home before it obtained

ownership of the lot where the home was to be built.[1] On May 14, 2021, pursuant to the Purchase Contract between Maynard (Builder) and Jagannathan (Buyer), Jagannathan sent two checks to Maynard totaling $91,297. On the contract itself, the term "earnest money" was crossed out and replaced with the term "cash advance," but on both checks sent by Jagannathan to Maynard, the "For" field in the bottom left corner reads "earnest cash advance." Jagannathan sent an additional check to Maynard in the amount of $14,574 for a change order. Construction of the home was underway but only about 50% complete before Maynard ceased work on this house and its other business operations. Maynard has been the subject of numerous foreclosure actions in the Fayette Circuit Court.

Discovery conducted in this case revealed that FSB had a close business relationship with Maynard. FSB had extended sixteen other loans to Maynard for the construction of other residential homes. Discovery also revealed that FSB had in its possession a copy of the contract between Maynard and Jagannathan at the time of the mortgage loan made to Maynard. FSB does not dispute that they [sic] had actual knowledge of that purchase contract and any payments made by Jagannathan. Jagannathan had no recorded lien, encumbrance or mortgage in the county clerk's office until their subsequent judgment lien in 2023. They had hired a builder (Maynard) to construct them a new home on the subject lot with the assumption that upon completion they would be the owners of the home.

April 8, 2025, Order, Record at 777-79 (footnote omitted).

At the conclusion of discovery, FSB and Jagannathan filed cross-

motions for the Circuit Court to determine summarily which party had priority and

---

[1] There is scant support in the record for this supposition regarding industry business practices.

entitlement to the remaining $105,872 in sales proceeds. However, it is important to note that FSB did not only argue that it was entitled to the entire amount, but also that it at least had priority to obtain part of that amount. Specifically, FSB contended that even if its actual notice of the May 14, 2021, Purchase Contract between Maynard and Jagannathan – and the contract's notation that Jagannathan had already advanced Maynard $91,297 of the contract price – had operated to give Jagannathan priority regarding $91,297 of the remaining sales proceeds, FSB still had first priority regarding the remaining $14,574. As grounds, FSB noted that Jagannathan's only claim to those remaining proceeds stemmed from his $14,574 advance to Maynard on April 12, 2022, pursuant to the March 23, 2022, contractual modification ("Change Order"). FSB argued that it did not have and could not reasonably have had any notice of this advance when it recorded its mortgage months beforehand on July 15, 2021.

The Circuit Court ultimately determined that Jagannathan was entitled to all of the remaining $105,872 in sales proceeds. Its rationale will be discussed in our analysis. This appeal followed the judgment.

## STANDARD OF REVIEW

We review summary judgments under well-established principles:

> The standard of review on appeal of a summary judgment is whether the trial court correctly found that

-5-

there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. Kentucky Rules of Civil Procedure (CR) 56.03. . . . "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). Summary "judgment is only proper where the movant shows that the adverse party could not prevail under any circumstances." *Steelvest*, 807 S.W.2d at 480, citing *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255 (Ky. 1985). Consequently, summary judgment must be granted "[o]nly when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor . . . ." *Huddleston v. Hughes*, 843 S.W.2d 901, 903 (Ky. App. 1992)[.]

*Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996). We review this appeal pursuant to that legal standard. And of course, as summary judgment is a matter of law, our review is conducted *de novo*, which is a fresh look without deference to the Trial Court. *See, e.g.*, *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001).

## ANALYSIS

Kentucky is a race-notice state. *See* Kentucky Revised Statute ("KRS") 382.270. Contrary to some of the arguments advanced in this case, that phrase does not mean that the first party to record an interest always and automatically takes priority over all other claims. Rather, under Kentucky law,

"a prior interest in real property takes priority over a subsequent interest that was taken with notice, actual or constructive, of the prior interest." *Mortgage Electronic Registration Systems, Inc. v. Roberts*, 366 S.W.3d 405, 408 (Ky. 2012). "Race-notice" is interpreted to mean that "the first person to the courthouse wins, *unless* he or she knows or should have known of a competing *equity* or prior claim." 3 KY. PRAC. *Real Estate Transactions* § 2:55 (2020) (emphasis added) (footnote omitted). Put another way, the law does not hold that a subsequently recorded interest advances in priority over a prior interest when the recorder has knowledge and/or notice of the first claim.

The issue *sub judice* is the Circuit Court's ruling that before FSB recorded its mortgage on July 15, 2021, it was already aware, or should reasonably have been aware, of Jagannathan's prior competing equity – amounting to an equitable lien. "[A]n equitable lien may arise from a contract which shows an intention to charge some particular property with a debt or obligation and . . . such lien will be enforced not only as between the parties, but as against one who takes with notice, or, like an assignee or receiver, stands in the shoes of the debtor." *Scoggan v. Dillon*, 252 S.W.2d 35, 37 (Ky. 1952).

With this precedent in mind, we begin our discussion with an analysis of the Circuit Court's detailed rationale for awarding the entire $105,872 in remaining sales proceeds to Jagannathan:

The fact that Maynard did not yet own the property at the time of contracting with Jagannathan is not dispositive of the issue of whether an equitable lien existed. Gabbard v. Watkins, 133 S.W.2d 54, 57 (Ky. 1939).

This Court finds this case analogous to the Tile House case, relied upon heavily by Jagannathan. Tile House v. Cumberland Fed. Sav. Bank, 942 S.W.2d 904 (Ky. 1997). The Kentucky Supreme Court in Tile House found an equitable lien on the property for two separate contracts entered by the homeowner, one for the purchase of the real property, and a separate contract for the development of a home on the property. Id. at 907. The Kentucky Supreme Court ultimately concluded that the bank which the homeowners mortgaged their property to was on actual notice of those two prior transactions, and as such the homeowners were entitled to an equitable lien prior and superior to the bank who issued a mortgage on the property. Id. Notably, the equitable lien award included the payment made to the contractor for the construction of the home, which did not directly involve the sale of the real estate. Id. at 905, 907.

It is clear that Maynard and Jagannathan intended that the funds paid by Jagannathan were to be utilized to purchase the property, build improvements thereon, and finally convey the real property free and clear of any encumbrances to Jagannathan. The parties clearly understood and intended that Jagannathan's money was to be used to acquire the property, and such payments were the "trigger" for the subsequent acquisition of a mortgage to acquire the property and construct the home. While it is true Jagannathan never had filed a recorded security interest until the 2023 judgment lien, FSB was on notice of the purchase contract. It extended a mortgage loan to Maynard with full knowledge of the likely interest the would-be purchaser of the new home under construction had.

-8-

Furthermore, even if there was not intent to create an equitable lien, the Court can, by declaration "out of the general consideration of right or justice as applied to the relations of the parties and circumstances of their dealings in this particular case" deem that a valid equitable lien existed. Owensboro Banking Co. v. Lewis, 106 S.W.2d 1000, 1004 (Ky. 1937) (citing Ringo v. McFarland, 24 S.W.2d 265, 268 (Ky. 1930)). This case involves two innocent parties (FSB and Jagannathan) being put in an unfortunate position due to Maynard's actions. However, FSB has already recovered $343,264.52.[2] Jagannathan has not recovered anything on their substantial losses, and they have no other alternative avenue to be made whole due to Maynard's insolvency. Additionally, between innocent parties, FSB as a sophisticated lending institution, was in the better position, especially having done sixteen previous deals with Maynard, to protect their [sic] mortgage interests from any equitable liens that they [sic] were on notice of. Liberty Nat'l Bank and Trust Co. of Louisville v. Pep Services, Inc., 600 S.W.2d 475, 476 (Ky. Ct. App. 1979) (citing Louisville Asphalt Co. v. Cobb, 220 S.W.2d 110, 112 (Ky. 1949)). FSB was in the superior position to assess and bear the risk of loss associated with the business relationship with Maynard.

It is undisputed that FSB was on notice of the payments made by Jagannathan to Maynard. FSB had in its possession a copy of the contract between Maynard and Jagannathan. FSB also had made sixteen other deals involving the same circumstances with Maynard throughout their course of dealings. A prior equitable lien takes priority over subsequent valid and recorded liens acquired with notice of the prior equitable interest. State Street Bank and Trust Co. of Boston v. Heck's, Inc., 963 S.W.2d 626, 631 (Ky. 1998) (citing Tile House, 942 S.W.2d at 906). Thus, it is clear from these facts that FSB was on actual . . . notice of Jagannathan's equitable

---

[2] Earlier in the Circuit Court's opinion, it used the figure "343,254.53."

interest on the subject real property, and FSB does not dispute as such.

Therefore, based on the foregoing, the Court finds as a matter of law that an equitable lien exists in favor of the Defendant/Counterclaimant Jagannathan, and that such lien is prior and superior to the lien the Plaintiff FSB has on the subject property.

April 8, 2025, Order, Record at 780-82 (footnotes omitted[3]).

On appeal, FSB repeats the contentions that it made below and criticizes the Circuit Court's rationale for rejecting them. First, FSB argues that Jagannathan could not have had an equitable lien on the 2425 Lorenzo Way property with priority over its mortgage because Jagannathan – unlike the homeowner in *Tile House* – did not directly contract with and pay a deposit to the owner of the real property at issue before the competing mortgage was recorded. Second, FSB asserts that Jagannathan never had what it considers a recognized equitable interest in the property. Third, FSB claims that Jagannathan's contract with Maynard could not have provided notice of a potential equitable lien because nothing in the contract explicitly stated that a lien was intended. Throughout its briefing, FSB repeatedly emphasizes its status as the purchase money lender.

Before proceeding, it is important for context to summarize *Tile House*, 942 S.W.2d 904, the 1997 Supreme Court case that all parties acknowledge

---

[3] The Circuit Court's order footnoted its various case citations. Instead, we have added them to the text of the order quoted above.

impacts the decision in this case. The issue there involved the priority of various liens associated with specific real property: the homeowners' equitable but unrecorded lien; a construction lender's recorded lien; and mechanics' liens. The homeowners had paid $3,000 as a "downpayment"[4] to the developer of the subdivision for the lot (the total cost of which was $43,750). *Id.* at 905. This first agreement, with the developer, was not recorded. *Id.* The homeowners then entered into an agreement with the builder for the construction of the house on the lot for a total cost of $252,363 (which included the cost of the lot, though a credit allowance was made for the $3,000 already paid). *Id.* This second contract, with the builder, was also not recorded. *Id.* Thereafter, the builder applied for a construction loan, furnishing the bank with a copy of both agreements. *Id.* After the title was checked, the lot was conveyed directly from the developer to the builder without any reference to the homeowners. *Id.* Likewise, the construction mortgage did not refer to the homeowners' interest. *Id.* Several mechanics' liens were then filed. *Id.* These lienholders did not know of, or appear to have reason to know of, the homeowners' interest. *Id.* When the project ultimately failed, the bank, as the construction lender, commenced foreclosure proceedings.

---

[4] In *Tile House*, where the words "downpayment" and "deposit" were used, there does not appear to have been the issue that exists here of the contract terms "earnest money" versus "cash advance," and Jagannathan's insertion of a different term, "earnest cash advance," on his check. We address the significance of these terms *infra*.

In *Tile House*, the Kentucky Supreme Court determined that the homeowners had an equitable lien. *Id.* at 906. Because that lien was not recorded, it could not take priority over the interest of lienholders, such as those with mechanics' liens, who had no notice of the homeowners' prior interest. *Id.* However, the homeowners' equitable, unrecorded lien would have priority over those who had actual notice of their existing interest, such as the developer, the builder, and the construction lender. *Id* at 906-07.[5]

With *Tile House* in mind, we turn to FSB's arguments against the Circuit Court's ruling. FSB theorizes that Jagannathan did not have a recognizable equitable lien; could not have had priority over its mortgage because Jagannathan – unlike the homeowners in *Tile House* – neither directly contracted with nor paid a deposit to the owner of the real property; and used a contract that did not contain the word "lien." We are unpersuaded by these interrelated contentions as the issue here is one of the actual or constructive notice of an obligation. The focus of the inquiry is neither upon the identity of the property owner nor contractual privity. Claims such as Jagannathan's have been recognized by binding precedent as equitable interests in property. And no law requires a contract to explicitly state

---

[5] Incidentally, the construction lender in *Tile House* did not seek the potential protection of subrogating the interest of the homeowners to its mortgage. *See Akers v. Cushman Constr. Co., Inc.*, 487 S.W.2d 60 (Ky. 1972).

that a lien was intended in order for the document – when provided, as here – to constitute legal notice.

Contextually, the Circuit Court in this matter correctly observed that the Kentucky Supreme Court deemed the *Tile House* homeowners' equitable lien to have priority over the competing, subsequently-recorded, mortgage. This precedence included not only what the homeowners paid to the developer toward the purchase of the real property, but also what the homeowners paid to the builder – by virtue of a separate contract – to improve the property. *Id.* at 905 and 907. Thus, in *Tile House*, as here, the homeowners' contract with the builder is sufficient on its own to qualify as notice. For purposes of establishing priority between a homeowner and a construction mortgagor, it matters not that the property is owned by the developer versus the builder. The central issue in lien priority is whether the mortgaging bank knew of the obligation of the builder to repay the homeowner before it extended the loan. FSB's statement that "direct payment to the landowner is an absolutely necessary element to obtaining equitable title," which it attributes to *Tile House*, is not supported by that case or any other legal authority. (Appellant's Brief, p. 4.)

*Tile House* supports the principle that awareness of an executed contract and payments made thereunder for the construction of a residence on a lot (*e.g.*, to improve the real property) constitutes sufficient notice to warrant granting

priority to the first, unrecorded and equitable lien. This unrecorded contract and the payments made thereunder qualify as notice because they establish "an intention to charge some particular property with a debt or obligation[.]" *Scoggan*, 252 S.W.2d at 37. They are thus sufficient notice – when actually or reasonably received – of a prior equitable interest in the real property that will result in legal priority. *Id.*

This principle of prior, known obligations taking precedence over subsequently-recorded interests is true regardless of whether those obligations are entitled as "liens." Nothing in the *Tile House* opinion indicates that either of the contracts at issue in that matter explicitly stated anything about the creation of a lien, or that those contracts needed to do so to support the existence of an equitable lien. This logic makes inherent sense because, by its very nature an equitable lien is a constructively imposed – versus explicitly stated – lien. Thus, FSB's arguments that a lien in equity can only be constructed for an existing lien, mortgage, sale deed, or title are invalid.

Privity of contract is not the question. The appellee in *Gabbard*, who also had no direct contract to purchase the subject real property, was deemed to have an equitable lien upon the real property because she had advanced part of the purchase price to her daughter and son-in-law as part of a separate agreement; and her daughter and son-in-law *then* purchased the property. 133 S.W.2d at 57. The

*Gabbard* Court found that the appellee's separate agreement to advance part of the purchase price supported the principle that her daughter and son-in-law therefore "held the property under conditions imposing a responsibility like that of a constructive trustee to use and employ the money furnished them to carry out their agreement had with [appellee]," which in turn justified recognizing and constructing an equitable lien on the property in favor of the appellee. *Id.*

Here, while Jagannathan did not directly contract to purchase the real property at issue before FSB recorded its mortgage, FSB had actual or inquiry notice beforehand of Jagannathan's interest. Specifically, FSB knew that: (1) Jagannathan had *already* advanced Maynard, the intended purchaser of the property at issue, $91,297 pursuant to an executed contract; and (2) pursuant to that executed contract, Maynard was required to apply the $91,297 that it had already received from Jagannathan toward effectuating that executed contract. And that contract required Maynard both to procure and improve the property at issue. We agree with the Circuit Court's conclusion that this actual knowledge provided FSB inquiry notice sufficient to alert it of Jagannathan's prior equitable interest in the property, *i.e.*, that Maynard would be holding and improving the property under conditions imposing upon Maynard a responsibility like that of a constructive trustee for Jagannathan's benefit.

-15-

We cannot accept the tenets of FSB's argument that Jagannathan was, for purposes of establishing an equitable lien or inquiry notice, also required to have directly contracted with the property owner to purchase the real property at issue before FSB recorded its mortgage. No legal precedent supports this argument, which when taken to its conclusion, would subvert or constrict the well-established principles of constructive liens in equity and their priority over subsequent lienholders who were on notice of the prior obligations.

Likewise, we do not find support for FSB's assertions akin to a "tracing" argument:

> No payment was made by [Jagannathan] to the land owner, nor was any amount of the "cash advance" applied to the purchase of the lot. (ROA 708 & ROA 723). In fact, FSBSE fully funded Maynard Builder's purchase of the land and construction of the residence with no amount of the "cash advance" being credited, applied, or taken into account whatsoever, in any of the loan documents. (ROA 708 & 723). The entire purchase price of the lot, $127,500, was paid directly by FSBSE on behalf of Maynard Builders to the lot owner, RBC, LLC. (ROA 723 & ROA 491). Thus, it is evident that [Jagannathan] did not fund the purchase of the lot and did not take any type of equitable interest in the subject property under the contract with Maynard Builders.

(Appellant's Brief, p. 7.) The cited documents located in the record at pages 491, 708, and 723 are respectively: (1) the deed to the property at issue; (2) a "loan balance information" statement generated by FSB; and (3) the HUD-1 settlement statement summarizing the July 6, 2021, closing. As FSB indicates, none of those

-16-

documents indicates that Maynard applied Jagannathan's $91,297 cash advance toward the purchase of the property or the costs of constructing the residence on the property. But, as we have emphasized, the central issue is the notice of funding, and not other issues, such as the distribution of the proceeds. Tellingly, FSB argues that Jagannathan's prior expenditure of funds was not in fact "taken into account whatsoever," but it too conveniently omits that it was aware of the extension of money and could (and should) have taken it into account. *Id.* FSB's silence speaks volumes about its own perilous choice to ignore the existence of payments of which it undisputedly had prior knowledge.

Notably, FSB cites no authority to support its contention that, despite its notice of Jagannathan's prior interest, its *subsequent* loan of *additional* funds to Maynard entitled the mortgage associated with its loan to *first* priority. Again, it is true that the record does not disclose Maynard's use of Jagannathan's cash. But significantly, FSB knew that Jagannathan had extended it; FSB knew that Maynard had received it; and FSB knew what Maynard was required to do with it. Furthermore, Maynard's receipt of those funds pursuant to its executed contract with Jagannathan was, as the Circuit Court noted, the "trigger," or the critical factor, which had induced FSB to make its loan to Maynard. In short, and critically here, FSB had notice of Jagannathan's interest; and FSB's notice has

always been the dispositive factor in this matter.  FSB's "tracing" argument is not relevant to this analysis and lacks merit.

FSB's next argument raises a finer point significant to the terms used and the practices in the industry.  As stated above, the Circuit Court noted that:

> Jagannathan sent two checks to Maynard totaling $91,297.  On the contract itself, the term "earnest money" was crossed out and replaced with the term "cash advance," but on both checks sent by Jagannathan to Maynard, the "For" field in the bottom left corner reads "earnest cash advance."

April 8, 2025, Order, Record at 777-79 (footnote omitted).  "Earnest money" and "cash advance" have different meanings, potentially qualifying as terms of art.  By executed contract, Jagannathan and Maynard explicitly chose to use "cash advance" language and expressly voided the printed words "earnest money."  The terms were significant enough to warrant a contract modification, and the deleting and replacement of "earnest money" with "cash advance" has meaning, or the parties would not have had reason to go to the trouble of making the change.  However, Jagannathan's unilateral notation on his personal check conflating the terms, whether reflecting his own misunderstanding or misgivings about the actual, agreed-upon terms, does not constitute an agreement or contract modification and has no legal import.

The record is unclear as to whether the contract at issue was a form builders' contract used by Maynard or a form buyers' contract used by

-18-

Jagannathan or a real estate agent. And such a difference does not appear to be of consequence here because both parties agreed to change the terms, and thus those terms cannot be construed more strictly against the drafter, whose terms were altered with mutuality. And unfortunately, the contract does not define either of those terms.

But the language used in the provision in the contract where the phrase "cash advance" appears indicates that "cash advance" was indeed intended by the parties to mean *money paid by Jagannathan toward the purchase of the real property at issue*. Specifically, the "purchase price" for the "property" – which incorporated both the to-be-constructed residence and underlying lot – was $760,811. *See* May 11, 2021 contract, §§ 1 and 2. Further, § 2 provided in relevant part:

> **2. PURCHASE PRICE**
>
> . . .
>
> **a. Earnest Money**. Upon execution of this Agreement, Buyer shall pay to Builder an ~~earnest money deposit~~ Cash Advance (the "Deposit") in the amount of $91,297.00 as a sign of good faith to bind this Agreement. *The Deposit shall be applied to the Purchase Price at closing*. . . .

(Emphasis added.)

-19-

FSB posits that Jagannathan and Maynard must not have intended for any of that money to be applied toward the property. That argument is unsupported. No other use is apparent or contemplated by the contract's terms.

We are not unaware that "earnest money" means a good faith deposit, as expressed directly in the contract here, and that it is often placed in escrow, to be credited at closing. And we do not ignore that "cash advances" are by their nature more readily spendable. Perhaps the parties here only meant to obtain immediately liquidated funds. But changing the contract in this fashion operated to create additional consequences, even if they were unintended.

Here, the contract was given to FSB, who by virtue of this provision, obtained knowledge and notice that Jagannathan had in essence loaned Maynard this particular sum of cash to use freely towards the construction of and closing on the property. FSB's protestations to the contrary notwithstanding, FSB was clearly on actual notice from its receipt of this contract that Jagannathan had given money to Maynard in return for property he did not yet possess, and that claim pre-existed FSB's loan for that property. Had the parties left the contract terms as they were, the money might have gone into escrow; Jagannathan might have received the funds when closing did not go forward; and this dispute might not have arisen. But these parties went in a different direction, which has led us here. FSB theorizes that a ruling against it on this point will harm the banking industry because title

searches will not reveal the existence of these contracts. But title searches are not the exclusive province of due diligence in making loans. And again, in this case FSB already knew of Jagannathan's prior cash advance for the property, a title or any other search was unnecessary to supplant knowledge that FSB had already acquired. FSB would have us ignore its own prior knowledge of a claim, and that is not what the law requires. FSB's cries of catastrophic consequences, including mandated title insurance for every loan, ring hollow. The law only requires a mortgagor such as FSB to be charged with responsibility for reading the documents that it was already provided. FSB's subsequent decision to charge ahead with making a loan while in full possession of the knowledge of a pre-existing interest cannot legally take precedence or priority over Jagannathan's rightful claim.

Next, FSB argues that because it recorded its mortgage on July 15, 2021, its mortgage enjoyed priority over both: (1) Jagannathan's subsequently-recorded judgment lien; and (2) Jagannathan's constructively imposed prior equitable lien to the extent that it incorporated what Jagannathan paid pursuant to the Change Order.

As to the first of those assertions, and as noted in detail above, the law generally rewards the first to record excepting those who have notice of a prior claim, as FSB did here. But Jagannathan's subsequently-recorded judgment lien is

not the dispositive issue here.  This case involves predominately Jagannathan's equitable lien, and again, when – and to what extent – FSB had notice of it.  As we have already explained, the Circuit Court's judgment hinged upon the rule that a prior equitable lien takes priority over subsequent valid and recorded liens acquired with notice of the prior equitable interest.  *See Heck's, Inc.*, 963 S.W.2d at 631.  This 1998 case is binding precedent.

As to FSB's second argument, we do find a substantive point of error.  Again, a prior equitable lien takes priority over subsequent valid and recorded liens acquired with *notice* of the prior equitable interest.  When FSB recorded its mortgage on July 15, 2021, it had at the very least inquiry notice that Jagannathan already had an equitable interest in the property amounting to $91,297.  However, FSB could *not* have had any notice of Jagannathan's additional equitable interest of $14,574 until *months later*, when Jagannathan advanced Maynard that sum on April 12, 2022, pursuant to the contractual modification of the March 23, 2022, Change Order.  Jagannathan did not address this point when FSB raised it before the Circuit Court, and the Circuit Court did not address it in its order.[6] Jagannathan continues to decline to address this point in appellate briefing.  We

---

[6]  We are cognizant that "[a] final judgment shall not be reversed or remanded because of the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to 52.02."  CR 52.04.  However, this was a purely legal issue, and factual findings are unnecessary in the context of summary judgments.  *See* CR 52.01.

have found no authority supporting this aspect of the Circuit Court's judgment, and it is contrary to espoused, race-notice principles. Accordingly, we reverse the order below to this extent.

For its final argument, FSB has repackaged each of its contentions that we have already rejected above into a "policy" argument asserting that the Circuit Court's judgment represents an unwarranted expansion of Kentucky's equitable lien jurisprudence. We will not address this composite argument because we have already rejected each of its constituent parts. We find the Circuit Court's analysis as set forth above well-supported, reasoned, and lacking error in all respects other than what we have set forth herein.

## CONCLUSION

For all of the reasons stated herein, we affirm in part and reverse in part. Accordingly, we direct the Circuit Court to enter an amended judgment on remand dividing the remaining sale proceeds consistently with this Opinion to give FSB the $14,574 it seeks from the prior award to Jagannathan.


ALL CONCUR.

BRIEFS FOR APPELLANT
FIRST STATE BANK OF THE
SOUTHEAST, INC.:

Christopher F. Douglas
M. Al-Edward Merrick
Pineville, Kentucky

BRIEF FOR APPELLEES
SUDHARSSAN JAGANNATHAN
AND SUJATHA SANTHANAM:

Zachary G. Cato
Lexington, Kentucky